## NATIONAL MARITIME UNION OF AMERICA et al. v. HERZOG et al.
### Civ. No. 4874-'47.

District Court of the United States for the District of Columbia.

April 13, 1948.

Judgment Affirmed June 21, 1948.

See 68 S.Ct. 1529.

PRETTYMAN, J., dissenting.

———◆———

William L. Standard, of New York City, David Rein and Joseph Forer (of Greenberg, Forer & Rein), of Washington D. C. and Herman Rosenfeld, of New York City, for plaintiffs.

Robert W. Kenny, President, of Los Angeles, Cal., Robert J. Silberstein, Execu-

tive Secretary, of New York City, Richard F. Watt, Chairman, Labor Law Committee, and Edmund Hatfield, both of Chicago, Ill., amicus curiae, for National Lawyers Guild.

A. Norman Somers, Asst. Gen. Counsel, Robert M. Denman, Gen. Counsel, David P. Findling, Associate Gen. Counsel, Mozart G. Ratner and William J. Avrutis, attorneys, National Labor Relations Board, all of Washington, D. C., for defendants.

Before WILBUR K. MILLER and PRETTYMAN, Associate Justices, United States Court of Appeals, District of Columbia, and LAWS, Chief Justice, District Court of the United States for the District of Columbia, sitting as a statutory three-judge court.

WILBUR K. MILLER, Associate Justice.

The National Maritime Union of America, its president and two of its members, complain of the National Labor Relations Board. They seek to enjoin the enforcement of the provisions of the Labor Management Relations Act, 1947,[1] which deny the privilege of being chosen as exclusive bargaining agent to a union which has not filed with the Secretary of Labor certain financial and structural information and the officers of which have not filed with the Board their affidavits denying membership in or affiliation with the Communist Party and denying belief in the overthrow of the United States Government by force; they say these provisions are unconstitutional.[2]

Plaintiff Union is a far flung organization of seamen. Its members are on ships in both oceans and in the Gulf of Mexico. During 1947 it expended more than $25,000 in attempting to recruit members among the sailors on ships in the Great Lakes. It was particularly interested in enrolling employees of the M. A. Hanna Company

---

[1] Act, June 23, 1947, c. 120, § 1 et seq., 61 Stat. 136 et seq., 29 U.S.C.A. § 141 et seq.

[2] The text of the assailed portions of the Act is as follows:

"Sec. 9(f) No investigation shall be made by the Board of any question affecting commerce concerning the representation of employees, raised by a labor organization under subsection (c) of this section, no petition under section 9(e) (1) shall be entertained, and no complaint shall be issued pursuant to a charge made by a labor organization under subsection (b) of section 10, unless such labor organization and any national or international labor organization of which such labor organization is an affiliate or constituent unit (A) shall have prior thereto filed with the Secretary of Labor copies of its constitution and bylaws and a report, in such form as the Secretary may prescribe, showing—

"(1) the name of such labor organization and the address of its principal place of business;

"(2) the names, titles, and compensation and allowances of its three principal officers and of any of its other officers or agents whose aggregate compensation and allowances for the preceding year exceeded $5,000, and the amount of the compensation and allowances paid to each such officer or agent during such year;

"(3) the manner in which the officers and agents referred to in clause (2) were elected, appointed, or otherwise selected;

"(4) the initiation fee or fees which new members are required to pay on becoming members of such labor organization;

"(5) the regular dues or fees which members are required to pay in order to remain members in good standing of such labor organization;

"(6) a detailed statement of, or reference to provisions of its constitution and bylaws showing the procedure followed with respect to, (a) qualification for or restrictions on membership, (b) election of officers and stewards, (c) calling of regular and special meetings, (d) levying of assessments, (e) imposition of fines, (f) authorization for bargaining demands, (g) ratification of contract terms, (h) authorization for strikes, (i) authorization for disbursement of union funds, (j) audit of union financial transactions, (k) participation in insurance or other benefit plans, and (l) expulsion of members and the grounds therefor;

and (B) can show that prior thereto it has—

"(1) filed with the Secretary of Labor, in such form as the Secretary may prescribe, a report showing all of (a) its receipts of any kind and the sources of such receipts, (b) its total assets and liabilities as of the end of its last fiscal year, (c) the disbursements made by it during such fiscal year, including the purposes for which made; and

"(2) furnished to all of the members of such labor organization copies of the

and the Wilson Transit Company, both of which operate fleets on the Lakes. The plaintiff labor organization had competition in that respect from the Seafarers International Union of North America, which was also attempting to organize the Hanna and Wilson seamen. Seafarers International filed petitions with the National Labor Relations Board pursuant to § 9(c) of the National Labor Relations Act, 29 U.S.C.A. § 159(c), raising questions concerning representation for collective bargaining of the employees of these two shipping companies. Hearing of this, the plaintiff Union intervened in the proceedings before the Board and sought the opportunity to be chosen as exclusive bargaining agent for the two bargaining units.

While these petitions were pending before the Board, Congress enacted the Labor Management Relations Act, 1947, commonly known as the Taft-Hartley Act, which contains the provisions the plaintiffs assail as violative of the Constitution. The defendant Board called the plaintiff Union's attention to those portions of the new statute which make the filing of the statements and affidavits to which we have referred obligatory upon a union which desires the privilege, conferred by the Wagner Act[3]

as amended, of being selected by a majority vote in a bargaining unit as exclusive bargaining agent for all the employees in the unit.

Time for compliance was extended, first to September 30 and then to October 31, 1947, and the Maritime Union was warned by the Board that its non-compliance would make it ineligible to be chosen by the employees of the two companies to enjoy the statutory privilege of being their exclusive bargaining agent. But the Union did not file the required statements with the Secretary of Labor and its officers did not file with the Board the affidavits contemplated by the Act. In November the Board ordered that elections be held pursuant to the petitions of the Seafarers International Union but denied to the Maritime Union a place on the ballots because of its refusal to comply with the provisions of the Taft-Hartley Act, which are now assailed by it. In due course the elections were held. The results were inconclusive in the Hanna case so that a run-off election will be conducted at a later date. A majority of the employees of the Wilson company voted against union representation. Thereafter this suit was filed.

---

financial report required by paragraph (1) hereof to be filed with the Secretary of Labor.

"(g) It shall be the obligation of all labor organizations to file annually with the Secretary of Labor, in such form as the Secretary of Labor may prescribe, reports bringing up to date the information required to be supplied in the initial filing by subsection (f) (A) of this section, and to file with the Secretary of Labor and furnish to its members annually financial reports in the form and manner prescribed in subsection (f) (B). No labor organization shall be eligible for certification under this section as the representative of any employees, no petition under section 9(e) (1) shall be entertained, and no complaint shall issue under section 10 with respect to a charge filed by a labor organization unless it can show that it and any national or international labor organization of which it is an affiliate or constituent unit has complied with its obligation under this subsection.

"(h) No investigation shall be made by the Board of any question affecting commerce concerning the representation

of employees, raised by a labor organization under subsection (c) of this section, no petition under section 9(e) (1) shall be entertained, and no complaint shall be issued pursuant to a charge made by a labor organization under subsection (b) of section 10, unless there is on file with the Board an affidavit executed contemporaneously or within the preceding twelve-month period by each officer of such labor organization and the officers of any national or international labor organization of which it is an affiliate or constituent unit that he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods. The provisions of section 35A of the Criminal Code shall be applicable in respect to such affidavits."

[3] What is commonly known as the Wagner Act is the National Labor Relations Act of July 5, 1935, c. 372, § 1 et seq., 49 Stat. 449, 29 U.S.C.A. § 151 et seq.

It is necessary, we think, first to examine the defensive plea that the plaintiffs lack capacity to sue; for that purpose we shall consider separately the status of the four plaintiffs, three of whom are individuals, and the Act's impact upon them.

Although it is alleged that neither Curran, the president of the Union, nor any other officer, has executed and filed the affidavit contemplated by § 9(h), the complaint, verified by Curran, contains this affirmative allegation: " * * * plaintiff Curran is not a member of the Communist Party, is not affiliated with said Party, does not believe in or advocate the overthrow of the government by force and violence, is not knowingly a member of and does not knowingly support or believe in any organization which advocates such doctrines, but has not executed the affidavit required by statute for the reason that it constitutes a trespass upon and an impairment of his right of free speech, press, and assembly, and for the further reason that the language of the statute is too vague, ambiguous and uncertain to establish a reasonable standard of conduct."

It thus appears that Curran has filed with us the affidavit which he asserts is unconstitutionally required by the statute. Filing with the Board an affidavit substantially similar to that contained in his complaint would prevent the denial of statutory benefits to his Union as far as his position as president is concerned. He is, consequently, quite willing and able to make the statutory affidavit but refrains from making and filing it with the Board solely because he regards § 9(h) as unconstitutional. Since he is not adversely affected by the statute, no injury can come to him as an individual because of it. It follows that he asks us to answer an academic question for him, which the courts consistently decline to do.[4] For this reason we conclude that Curran has no standing as an individual to maintain this suit. Neither can he do so in his capacity as president, for the Union sues as an entity and its president's participation as a plaintiff is not necessary to enable that organization to state a cause of action. We conclude that Curran cannot sue in either capacity.

The other two individual plaintiffs are seamen who are members of the plaintiff Union. They say that they will be deprived of representation by the collective bargaining agent of their choice; that they will be deprived of the opportunity to work under wage standards and working conditions established and maintained by the National Maritime Union, which wages and conditions are superior to any others in the industry; and that they will be deprived of a voice in the establishment of their wage standards and hiring and working conditions unless they surrender their membership in the National Maritime Union.

These individual plaintiffs have no constitutional right to be represented by the collective bargaining agent of their choice. Each time a union, chosen by a bare majority vote in a bargaining unit, is certified as the exclusive bargaining agent for that unit, the employees who did not vote with the majority are deprived of representation by a collective bargaining agent of their choice. It has never been held that the Wagner Act is therefore invalid.

Furthermore, neither the Constitution nor any statute guarantees the members of the National Maritime Union the right to work under wage standards and working conditions established and maintained by that Union. Nor will these two plaintiffs be deprived of a voice in the establishment of wage standards and hiring and working conditions unless they

---

[4] Cf. Stearns v. Wood, 236 U.S. 75, 78, 35 S.Ct. 229, 230, 59 L.Ed. 475, where the Supreme Court said: "The general orders referred to in the bill do not *directly* violate or threaten interference with the personal rights of appellant—a major in the National Guard, whose present rank remains undisturbed. He is not, therefore, in position to question their validity; and certainly he may not demand that we construe orders, acts of Congress, and the Constitution for the information of himself and others, notwithstanding their laudable feeling of deep interest in the general subject. The province of courts is to decide real controversies, not to discuss abstract propositions." (Italics supplied.)

surrender their membership in the National Maritime Union. This is so because, if some union which complies with § 9 is voted for by a majority of those in the bargaining units to which these individuals belong, they will have through that union, regardless of their non-membership in it, a voice in the establishment of their wage standards and hiring and working conditions. This will be true even though they continue to be members of the National Maritime Union. If their bargaining units should cast a majority vote against any union, these individuals will continue to have the right to bargain with their employers as individuals, and the National Maritime Union to which they belong will continue to have the right to bargain collectively, for its members only, with those employers. It is true that in the latter instance there is no coercion of law upon the employers to bargain with them or with their union; but they have no constitutional right to have that coercion put upon an employer, and no statutory right to it, except when an exclusive bargaining agent has been chosen by the employees.

 From what has been said, it is seen that these two individuals make no showing in the complaint of an invasion of their constitutional rights and so they cannot maintain this action. Considered on a motion to dismiss, the complaint does not show injury to the plaintiff Union's constitutional rights so as to give it standing to challenge the validity of the portions of the statute here involved, for the reason that it is not affirmatively shown that the Union has a Communist among its officers. It appears from an affidavit in the record, however, that at least one of its officers is a member of the Communist Party, a fact which makes it impossible for the Union to qualify under § 9(h). That fact could be shown by a brief amended complaint. Since we have that information, we proceed to consider the constitutional validity of the three subsections of § 9.

 In entering upon a consideration of this case we bear in mind the elementary principle, which cannot too often be repeated, that a court usurps legislative functions when it presumes to adjudge a law void where the repugnancy between the law and the Constitution is not established beyond reasonable doubt. The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.[5] So if a court be in doubt whether a law be or be not in pursuance of the Constitution—where the repugnancy is not clear and beyond doubt,—it should refrain from making the law void in effect by its judgment, lest it should be really repealing a valid law by a legislative act, instead of declaring it void by a judicial act.[6]

 Quite apart from any statutory provision, employees have always had the right to organize trade unions, and through them to bargain collectively with employers concerning wages, hours, working conditions or any other appropriate subject. It is further true that a single employee has always had the right to bargain with his employer. Congress observed, however, that although employees had the right to organize and bargain, they did not have the power to do so on a basis of equality with employers; that this lack of power produced industrial unrest; and that strikes and other manifestations of such unrest interfered with the free flow of commerce.

 To correct the situation so observed, and pursuant to its broad power to regulate interstate commerce and to promote the general welfare, Congress acted to give employees equality of bargaining power and so to remove the basic cause of discontent which tended to impede commerce. It added to the fundamental right of employees to organize and to bargain with their employers, certain important privileges and benefits which had not existed theretofore. Not only was the right to organize unions and to bargain through them affirmed; but also the privilege of becoming the exclusive bargaining agent of all employees in a bargaining unit was

---

[5] Fletcher v. Peck, 1810, 6 Cranch 87, 128, 10 U.S. 87, 3 L.Ed. 162.

[6] Tucker, "The Constitution of the United States," v. 1, p. 377.

156

extended to a labor organization favored by a majority of such employees. Moreover, employers were required to bargain collectively with the representative chosen by majority vote. This, to be sure, was an abridgment of the minority's fundamental rights, as well as those of employers. But the importance of the broad public purpose sought to be served justified the means employed.[7]

■ Important in the consideration of the present case is the fact that, apart from the National Labor Relations Act, no union has the right to be exclusive bargaining agent. That extraordinary privilege is extended by the statute and except for the Act, employers are not under compulsion to bargain collectively.

After some twelve years of experience with the Wagner Act, Congress said,[8] after repeating the broad purpose of promoting the flow of commerce by protecting workmen's right to organize and attain equality of bargaining power, and by so removing what are known to be sources of industrial strife: "Experience has further demonstrated that certain practices by some labor organizations, their officers, and members have the intent or the necessary effect of burdening or obstructing commerce by preventing the free flow of goods in such commerce through strikes and other forms of industrial unrest or through concerted activities which impair the interest of the public in the free flow of such commerce. The elimination of such practices is a necessary condition to the assurance of the rights herein guaranteed." Having so declared, Congress proceeded to amend the Wagner Act by adding, inter alia, the three subsections of § 9 which are here assailed. Provision is still made to extend to a labor organization the important privilege of being chosen by a simple majority as the exclusive bargaining representative of all employees, which the employer is required to recognize. But, in order to eliminate "certain practices by some labor organizations, their officers, and members" which "have the intent or

the necessary effect of burdening or obstructing commerce", Congress decided to condition the privilege of being an exclusive bargaining agent with which an employer must deal. The Union's position simply is that it lacked the power to do so in the manner set forth in § 9(f), (g) and (h). These provisions will be separately considered, except that we shall first take up one of the plaintiff's contentions that is common to all three.

■ It is contended that the defendants have exceeded their power under the statute because it is said there is no true statutory bar to the appearance of the plaintiff Union on the ballot, or even to its certification. In support of this idea the plaintiff points out that the Act merely declares that the Board shall not investigate a "question * * * concerning the representation of employees, raised by a labor organization" unless it shall have complied with prescribed requirements. It observes that other provisions show that such a question is raised by petition. The plaintiff then points out that the question concerning representation involved in this case was raised by the petition of the Seafarers International Union; that the plaintiff merely intervened after the question had been raised, "to protect its own interests and those of its members." This amounts to saying that the Board may do for an intervening union what the statute forbids it to do for a petitioning union; that is, that it may certify as exclusive bargaining agent a union which has refused to comply with the conditions precedent to that privilege, simply because the noncomplying union entered the Board's proceeding by intervention. We cannot agree.

Turning then to subsection (f), we find that it forbids the Board to investigate a question of representation raised by a labor organization under subsection (c), or to entertain a petition to authorize or rescind a closed shop agreement, or to issue a complaint pursuant to a union's charge of unfair labor practices, unless

---

[7] The National Labor Relations Act, before amendment in 1947, was held to be constitutional. National Labor Relations Board v. Jones & Laughlin Steel Corp.. 301 U.S. 1, 57 S.Ct. 615, 81 L. Ed. 893.

[8] Act, June 23, 1947, c. 120, § 101, 61 Stat. 136, 29 U.S.C.A. § 151.

the union shall theretofore have filed with the Secretary of Labor copies of its constitution and bylaws and a statement containing prescribed data concerning its financial setup and its general method of dealing with its members, and that it has furnished to each of its members a copy of the financial report required to be filed with the Department of Labor.

We shall first summarize the plaintiff's argument in support of its assertion that subsection (f) is unconstitutional. A direct reference to it in its principal brief is in these words: " * * * If the Congress felt that the information prescribed by Sec. 9(f) was necessary, then there were other available means to require that the information be supplied; it was not necessary and, indeed, not reasonable to demand it under virtual threat of destruction." The following appears in the reply brief of the Union: "The plaintiffs contest the validity of Section 9(f) not because it withdraws benefits and not because it creates competition, but because, on the facts of this case, it directly impairs their basic liberties. It is not the withdrawal of a privilege which constitutes the illegal sanction, but the burden imposed on these rights. Cf: Electric Bond & Share v. Securities and Exchange Comm., 303 U.S. 419, 442, 58 S.Ct. 678, 82 L.Ed. 936, 115 A. L.R. 105; Helvering v. Mitchell, 303 U.S. 391, 399, 58 S.Ct. 630, 82 L.Ed. 917. But penalties which involve invasion of constitutionally protected activities are another matter. As Thornhill v. Alabama, supra, [310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093], makes clear, a condition imposed upon the enjoyment of rights protected by the Bill of Rights cannot be saved by an argument of reasonableness. It is the mere exertion of the power, not the extent of its exercise which is drawn in question. See also Schneider v. Irvington, 308 U.S. 147, 164, 60 S.Ct. 146, 84 L.Ed. 155. It is the plaintiffs' view that they need not establish that the reporting was unreasonable, but that the results which flow are beyond the power of Congress to impose."

Arguing orally at the bar, plaintiff's counsel said: " I mean (f) and (h). We believe they are both unconstitutional because of the sanctions which are imposed. They are unconstitutional sanctions."

Also during the oral argument the following colloquy occurred between the plaintiff's counsel and a member of the court:

"Justice Prettyman: You are conceding, at least arguendo, that Congress might require you to make financial reports.

"Mr. Standard: Certainly. We filed in Florida. If unconstitutional sanctions are not imposed, we recognize that states have certain rights to regulate, under the police power, and under other rights to regulate, but they cannot regulate under the pretext that they are regulating, and interfere with a federally protected right."

In support of this position plaintiff cites Western Union Telegraph Company v. Massachusetts, 125 U.S. 530, 8 S.Ct. 961, 31 L.Ed. 790, and Hill v. Florida, 325 U.S. 538, 543, 65 S.Ct. 1373, 1375, 89 L.Ed. 1782. It is our view that neither of these cases has application here. The first involved a tax which Massachusetts imposed on the Western Union's property in that state. The taxing statute provided that, unless the tax were paid, the Western Union would not be permitted to function in Massachusetts. Holding the state had the right to impose the tax, the Supreme Court ruled that it could not, for its non-payment, deprive the company of the right to do business, for that right was federally protected. In Hill v. Florida a state statute had been so construed and applied that a union was prohibited from functioning as collective bargaining agent, or in any other capacity, except upon conditions fixed by the state which were not included in the National Labor Relations Act. Among these was a requirement that certain information be filed and that an annual fee of $1 be paid. The provision that information be supplied and an annual fee be paid was held not to conflict with the federal Act but, for failure to comply, the union had been enjoined by a state court from functioning. The Supreme Court said: " * * * It is the sanction here imposed, and not the duty to report, which brings about a situation inconsistent with

158

the federally protected process of collective bargaining."

The case before us is readily distinguished from the Supreme Court opinions just discussed. The sanction there imposed by state statute was repugnant to a right created by a federal statute, and for that reason could not stand. It was not held, nor even intimated, that the sanction would have been in itself unconstitutional, had it not impinged upon a federal law. Here there is no imposition of a sanction beyond the power of the legislative body, as in the Massachusetts and Florida laws. Here in reality no sanction is imposed. Congress exercised its power under the commerce clause, and under the general welfare provision of the Preamble, to adopt legislation intended to promote the free flow of commerce by extending extraordinary rights to labor organizations, rights which do not exist except for the statute; it concluded that the public, and particularly the employees in a bargaining unit called on to ballot concerning the choice of a bargaining agent, have a substantial interest in knowing pertinent facts concerning the organization which seeks the statutory privilege of being the exclusive bargaining representative. This is exactly what the Supreme Court held to be proper in Lewis Publishing Company v. Morgan.[9] Concerning the requirement that publishing companies desiring second class mail privilege first furnish information not greatly unlike that contemplated by § 9(f), the Court said: " * * * We believe that, since the general public bears a large portion of the expense of distribution of second-class matter, and since these publications wield a large influence because of their special concessions in the mails, it is not only equitable but highly desirable that the public should know the individuals who own or control them."

The argument of the plaintiff, which we have summarized above, concedes that Congress had the right to require the reports called for by § 9(f) but asserts that it had no right to withhold from a union which refused to file them, the privilege conferred by the same statute

of being chosen as exclusive bargaining agent. The "results that flow" from so doing will be virtual destruction of the union, plaintiff says. Those results flow, not from the operation of the statute, but from the plaintiff's willful refusal to furnish information which they admit is constitutionally required. The Supreme Court in Milwaukee Publishing Company v. Burleson, 255 U.S. 407, 416, 41 S.Ct. 352, 355, 65 L.Ed. 704, had before it the same sort of argument made by a relator plaintiff whose second class mail privilege had been revoked by the Postmaster General because its paper had violated the provisions of the Espionage Act, 18 U.S.C.A. § 343 et seq. The Court said: " * * * It was open to the relator to mend its ways, to publish a paper conforming to the law, and then to apply anew for the second-class mailing privilege. This it did not do, but for reasons not difficult to imagine, it preferred this futile litigation, undertaken upon the theory that a government competent to wage war against its foreign enemies was powerless against its insidious foes at home. Whatever injury the relator suffered was the result of its own choice * * *." So it is here. If the plaintiff Union suffers the loss of a chance to be chosen as exclusive bargaining agent because of its failure to file the reports exacted by § 9(f), the injury is the result of its own chioce in deciding not to file the statements which it admits are constitutionally required.

The ruling of the Supreme Court in Lewis Publishing Company v. Morgan, supra, controls this case, as far as § 9(f) is concerned. There the Court had before it, as we have said, an act of Congress which required publishers to file a statement containing information quite similar to that exacted of labor unions by § 9(f) and denying second class mail entry for non-compliance. Like the distinction made by that statute between publishers who supplied the requisite information and those who did not, the distinction which § 9(f) makes between unions whose officers file the required affidavits and those whose officers decline to do so is "rested

---

9 229 U.S. 288, at page 312, 33 S.Ct. 867, at page 874, 57 L.Ed. 1190.

upon broad principles of public policy; in other words, upon the conceptions of Congress as to how far it was wise for the general welfare to give advantages to one class not enjoyed by another." 229 U.S. at page 303, 33 S.Ct. at page 870.

It is certain here, as the Supreme Court said it was in the Lewis Publishing Company case, that "for the purpose of securing the public benefits which it was conceived would result from the giving of the privilege, it was deemed that the power and duty existed to fix a standard which should be complied with by those who wished to enjoy the privilege, * * *." 229 U.S. at pages 304, 305, 33 S.Ct. at page 871.

The question here is, as it was in the Lewis Publishing Company case, whether the requirement that statements be filed is incidental to the power, which Congress was exercising, of granting an extraordinary privilege. If Congress has power to discriminate in favor of a union chosen by a majority of the employees in a bargaining unit, "the right to exercise that power carries with it the authority to do those things which are incidental to the power itself or which are plainly necessary to make effective the principal authority when exerted." 229 U.S. at page 314, 33 S.Ct. at page 875. McCulloch v. Maryland, 1819, 4 Wheat. 316, 17 U.S. 316, 4 L.Ed. 579; Gibbons v. Ogden, 1824, 9 Wheat. 1, 22 U.S. 1, 6 L.Ed. 23.

So, the ultimate and narrow question therefore is, as was said in the Lewis Publishing Company opinion, "* * * Are the requirements of the provision in question incidental to the purpose intended to be secured" in granting the privilege of exclusive representation for bargaining purposes? 229 U.S. at page 314, 33 S.Ct. at page 875. It is clearly incidental to the power of granting the unusual privilege of being exclusive bargaining agent, to prescribe qualifications which must be possessed by those who would achieve that statutory status.

Just as in the Lewis Publishing Company case, we are not here concerned with a general regulation nakedly requiring the filing of information, but "solely and exclusively" with the right of unions to con-

tinue to enjoy great privileges and advantages, "a right given to them by Congress upon condition of compliance with regulations deemed by that body incidental and necessary to the complete fruition of the public policy lying at the foundation of the privileges accorded." 229 U.S. at page 316, 33 S.Ct. at page 875.

The decision of Mr. Chief Justice Hughes, writing for the Court in Electric Bond & Share Company v. Securities and Exchange Commission, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105, is further precedent in this connection. The Chief Justice stated that case in this manner, 303 U.S. at pages 426, 427, 58 S.Ct. at page 679:

"The Securities and Exchange Commission brought this suit to enforce the provisions of sections 4(a) and 5 of the Public Utility Holding Company Act of 1935. 49 Stat. 803, 812, 813, 15 U.S.C.A. §§ 79d (a), 79e. These sections provide for registration with the Commission of holding companies, as defined, section 5(a), 15 U.S.C.A. § 79e(a), and prohibit the use of the mails and the instrumentalities of interstate commerce to those companies which fail to register. Section 4(a), 15 U.S.C.A. § 79d(a). Section 5(b), 15 U.S.C.A. § 79e(b), provides for the filing of a registration statement giving information with respect to the organization, financial structure and nature of the business of the registrant, together with various details of operations.

"Defendants, including intervenors, contested the validity of these provisions and sought by crossbill a declaratory judgment that the act was invalid in its entirety, 15 U.S.C.A. § 79 et seq., as being in excess of the powers granted to Congress by section 8 of Article I, and in violation of section 1 of Article I and of the Fifth and Tenth Amendments, of the Constitution of the United States. * * *"

In the course of the opinion, 303 U.S. at pages 437, 438, 58 S.Ct. at page 684, it is said: " * * * Regulation requiring the submission of information is a familiar category. Information bearing upon activities which are within the range of congressional power may be sought not only by congressional investigation as an aid to

appropriate legislation, but through the continuous supervision of an administrative body. * * * An illustration of the latter is found in the statute relating to newspapers and periodicals, enjoying the privileges accorded to second class mail, which requires an annual statement setting forth the names and addresses of the editor, publisher, business manager, owner, and, in case of ownership by a corporation, the stockholders, and also the names of known bondholders or other security holders, together with a statement as to circulation. 39 U.S.C. § 233, 39 U.S.C.A. § 233. See Lewis Publishing Co. v. Morgan, 229 U.S. 288, 33 S.Ct. 867, 57 L.Ed. 1190."

Later in the opinion, having observed that the electric companies had continuous and extensive operations in interstate commerce, the Court said, 303 U.S. at page 440, 58 S.Ct. at page 686: " * * * Congress cannot be denied the power to demand the information which would furnish a guide to the regulation necessary or appropriate in the national interest. Regulation is addressed to practices which appear to need supervision, correction or control. And to determine what regulation is essential or suitable, Congress is entitled to consider and to estimate whatever evils exist."

One of the questions involved in that case was whether Congress could prohibit the use of the mails and the instrumentalities of interstate commerce to holding companies which failed to file registration statements with the Commission. In that connection the Court said, 303 U.S. at page 442, 58 S.Ct. at page 686: "In the imposition of penalties for the violation of its rules, Congress has a wide discretion. Sanctions may be of various types. See Helvering v. Mitchell, ante, 303 U.S. at p. 391, 58 S.Ct. 630, 82 L.Ed. 917. They may involve the loss of a privilege which would otherwise be enjoyed. Id. Note 2. When Congress lays down a valid rule to govern those engaged in transactions in interstate commerce, Congress may deny to those who violate the rule the right to engage in such transactions. Champion v. Ames, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492; United States v. Delaware & Hudson Co., 213 U.S. 366, 415, 29 S.Ct. 527, 53 L.Ed. 836; Brooks v. United States, 267 U.S.

432, 436, 437, 45 S.Ct. 345, 346, 69 L.Ed. 699, 37 A.L.R. 1407; Gooch v. United States, 297 U.S. 124, 56 S.Ct. 395, 80 L.Ed. 522; Kentucky Whip & Collar Co. v. Illinois Central R. Co., 299 U.S. 334, 335, 346, 347, 57 S.Ct. 277, 279, 280, 81 L.Ed. 270. And while Congress may not exercise its control over the mails to enforce a requirement which lies outside its constitutional province, when Congress lays down a valid regulation pertinent to the use of the mails, it may withdraw the privilege of that use from those who disobey. Champion v. Ames, supra; Lewis Publishing Co. v. Morgan, 229 U.S. 288, 33 S.Ct. 867, 57 L.Ed. 1190."

Plaintiff's misconception of the nature of the Taft-Hartley Act lies at the root of much of its argument, and renders inapposite many of the authorities which it cites. That misconception is well illustrated by a sentence in its brief which reads, "This statute is not to be considered as one which confers a privilege upon conditions." That was indeed true of the original National Labor Relations Act which, before amendment, conferred the privilege of exclusive representation, with attendant coercion upon the employer, without imposing any conditions upon the union. If the Taft-Hartley Act be considered alone, without any reference to the Wagner Act which it amends, it would be accurate to say, as plaintiff does, that it "is not to be considered as one which confers a privilege upon conditions." The Taft-Hartley Act, however, does not stand alone. It is amendatory of the Wagner Act and, upon adoption, became a part of it, so that the two measures are read together as the National Labor Relations Act, as amended. The Wagner Act conferred the privilege unconditionally. The Taft-Hartley Act imposed conditions. The united statutes confer the privilege upon conditions.

Plaintiff's misapprehension of the statute's nature to which we have just referred doubtless gave rise to further confusion which is apparent throughout its argument. In addition to thinking of the Wagner Act and the Taft-Hartley Act as two independent, unrelated enactments, the plaintiff errs fundamentally in assuming

the privilege of exclusive bargaining agency to be a basic, constitutional right. Having made that erroneous assumption, it is an easy step which plaintiff takes to the conclusion that the Taft-Hartley Act impinges on a constitutional right by conditioning the privilege of exclusive representation.

A few quotations from its brief will demonstrate the plaintiff's confusion in thinking of the Wagner Act's privilege as a constitutional right. For example, it is said, "The defendants have, in effect, removed the plaintiff union from participation in the collective bargaining process and enjoined its members from any real efforts on its behalf or on their own."
The quoted statement could have, with equal logic, been made of the defendant Board, before the passage of the Taft-Hartley Act, by any union which had lost an election and seen a rival union chosen as exclusive bargaining agent. The statement is specious in either situation. Obviously, the defendants have not removed the plaintiff Union from participation in the collective bargaining process. The Wagner Act, as amended, offers, upon prescribed conditions, the opportunity of participating in the *exclusive* bargaining process, and it is the plaintiff's decision not to meet the conditions which removes its chance to enjoy the exclusive process of bargaining.

Again, we find in the plaintiff's brief the assertion that "The plaintiff union has been forcibly removed from the collective bargaining arena." The same error inheres in the statement. It is the *exclusive* bargaining arena which the plaintiff would enter. Such an arena exists only by the grace of the statute, and admission to it can be had only upon statutory terms.

In the same vein, the plaintiff says in its brief, " * * * Thus the defendants have, by their enforcement of the Act, brought the plaintiffs close to the point where their fundamental liberty of organization is reduced to a struggle for survival under conditions which will be overcome, if at all, *only by economic strife.*" (Emphasis added.)
In this instance, also, it may well be suggested that any union, defeated by a

rival in a representation election, could just as logically condemn the Board for enforcing the Wagner Act as it was before amendment. Whenever two unions seek to be chosen by employees and one is favored by a majority, the other union is thereby removed from that particular bargaining arena, and is brought close to the point where, according to this plaintiff, its "fundamental liberty of organization is reduced to a struggle for survival under conditions which will be overcome, if at all, *only by economic strife.*" (Emphasis supplied.)

■ We are clearly of the opinion, from the reasoning of the authorities cited, that Congress was acting within its power when it imposed upon unions desiring to continue to enjoy the new and valuable benefits of the Wagner Act the duty of first filing the statements described in § 9(f). And § 9(g), which requires annual renewals of the organizational data exacted by § 9(f), is, of course, equally impervious to the plaintiff's attack.

■ The foregoing discussion of § 9(f) and the conclusion we have reached substantially narrow the area of argument with respect to § 9(h), to a consideration of which we now turn. That the Wagner Act confers a privilege is beyond doubt; that a privilege granted by Congress may be conditioned by it is almost axiomatic and is thoroughly established as an elementary principle. Since we have already decided that the statutory privilege may be withheld for failure to conform to conditions which are constitutionally valid, our only task with respect to § 9(h) is to consider whether the condition there imposed upon the grant of privilege is repugnant to the basic law.

The condition imposed by § 9(h) is, of course, that the chance to be chosen as exclusive bargaining agent shall not be extended to a labor organization unless its officers have theretofore filed with the Board their affidavits that (a) they are not members of, or affiliated with, the Communist Party, and (b) they do not believe in the forcible overthrow of the United States Government. As to the second statement, plaintiff does not assert invali-

dity, so we are concerned only with the non-Communist angle of the affidavit.

 It is forbidden by a federal statute "to knowingly or willfully advocate, abet, advise, or teach the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence, or by the assassination of any officer of any such government" or to be a member of or affiliated with any society or group which teaches, advocates, or encourages such action.[10] Despite this provision, we assume for the purposes of this case that it is not at present unlawful in America to belong to the Communist Party or to believe in its doctrine. The problem, therefore, is whether, in offering to grant a legislative favor, the Congress may declare ineligible to receive it those who engage in an activity or an affiliation not per se illegal. Authorities already cited show that Congress may do so if the test of eligibility is not purely whimsical; that is, if it bears a reasonable relation to the legislative objective,—if there is a substantial basis in fact for imposing the test.

Before the enactment of the Taft-Hartley Act, of which § 9(h) is a part, extensive hearings were conducted by congressional committees at which alarming evidence was presented that Communists in positions of authority in trade unions tend to foment industrial unrest and strife, not to attain legitimate economic aims, but to serve political purposes; that they thus impede the flow of commerce in the very teeth of the Act's purpose to promote it. Quotations from the abundant evidence presented to the committees would prolong this opinion unduly. Suffice it to say it afforded ample basis for the formation of a legislative policy to curb Communist influence in labor relations.

"Moreover," as was said by the United States Court of Appeals for the District of Columbia on March 18, 1948, in Barsky v. United States, 167 F.2d 241, "that the governmental ideology described as Communism and held by the Communist Party is antithetical to the principles which underlie the form of government incorporated in the federal Constitution and guaranteed by it to the States, is explicit in the basic documents of the two systems; and the view that the former is a potential menace to the latter is held by sufficiently respectable authorities, both judicial and lay, to justify Congressional inquiry into the subject. In fact, the recitations in the opinion of the Supreme Court in Schneiderman v. United States, 1943, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796, are sufficient to justify inquiry. To remain uninformed upon a subject thus represented would be a failure in Congressional responsibility." In a footnote the court referred to abundant authority consisting of judicial decisions and source material.

If the view, so widely held, that Communism is, in general, a menace to our form of government, justifies congressional inquiry, then it must follow that when there were added to that general threat numerous specific instances in which Communists have used labor unions to do harm to the national economy, Congress was justified in refusing to give them a statutory advantage with which more effectively to injure the public interest. In the clearly established circumstances, it is difficult to follow plaintiff's argument that § 9(h) imposes "penalties on trade unions * * * for the conduct and opinions of their officers * * * *in altogether unrelated fields.*" (Emphasis added.) Unfortunately, it is demonstrated truth that union officers of that belief too often bring the purposes of Communism into the "unrelated field" of labor relations.

 Our conclusion is that Congress advisedly and justifiably provided that labor organizations whose officers decline to deny membership in or affiliation with the Communist Party shall not be eligible to assume the important statutory role of exclusive bargaining agent. That provision of the law is not, however, the real target of the plaintiff's assault on the ground of unconstitutionality, as will presently appear.

The gist of § 9(h) is contained in a single sentence, but upon examination that sentence is seen to make, in reality, two important provisions: (a) that Communist-

---

[10] 18 U.S.C.A. § 10.

officered unions may not enjoy the statutory privilege, and (b) that the Board shall ascertain from the officers of a union seeking the privilege whether they belong to or are affiliated with the Communist Party. Manifestly, the two provisions are neither identical nor similar. The former is a direct restriction upon the grant of a benefit, defining a class to which it will not be offered; the latter is a command that administrative inquiry be made in order to determine whether an applicant is eligible to receive the benefit.

For reasons heretofore given, we have concluded that Congress validly excluded from the enjoyment of the statutory advantage any union having a Communist as an officer. Plaintiff's real attack is made upon the second provision of § 9(h) which commands the Board to require the affidavit as proof of eligibility under the first provision of the section. That is, of course, a command to the Board to make an inquiry, to ask the question, "Are you a Communist?" In putting the query, the Board does nothing more than seek factual information to use as a guide in making the condition effective; for the Act does not require the question to be answered, does not punish the witness for declining to answer, and does not penalize him if he answers by saying he is a Communist. If the union official refuses to answer, or answering says he belongs to or is affiliated with the Communist Party, the only consequence is that the statute's benefit is withheld from his union,—a consequence validly visited, as we have seen.

With the affidavit requirement thus established as nothing more than an administrative inquiry which Congress directed to be made, we find the following statement from Barsky v. United States, supra, to be directly applicable: "If Congress has power to inquire into the subjects of Communism and the Communist Party, it has power to identify the individuals who believe in Communism and those who belong to the party. * * * The problem relates to the power of inquiry into a matter which is not a violation of law."

Section 9(h), in requiring the affidavit, seeks nothing except to identify the individuals who believe in Communism and those who belong to the Party.

The problem before us is thus reduced to the question whether the Board's permissible effort, in the course of its regulation of labor unions, to identify the individuals who are Communists violates the First, Fifth and Ninth Amendments when it takes the form of asking them to identify themselves.

Plaintiff says § 9(h) abridges the freedom of its officer not to say he is a Communist. Freedom of speech is said to include freedom of silence.[11] If this provision of the Act were a simple legislative requirement, standing entirely alone and unrelated to a legitimate legislative purpose, that union officers deny under oath membership in or affiliation with the Communist Party, the point might be well taken. But this Act does not require any union officer to say whether he is a Communist. He may be one and remain silent about it, as is his constitutional right; and the Act under consideration will not disturb him. It is therefore clearly wrong to say that § 9(h) impinges on a union officer's freedom of speech.

[11] On this contention, our position is that taken by the United States Court of Appeals in Barsky v. United States, supra, stated as follows: "It is urged by the appellee Government that freedom of speech does not encompass freedom to remain silent. There is justification for the contention that the latter is a freedom of privacy, different in characteristics and governed by different considerations from the constitutionally protected freedom of speech. At least, the basic public policies which underlie the two are different. The public policy which supports freedom of speech is that the safety of democratic government lies in open discussion—discussion of grievances, remedies, of 'noxious doctrine' as well as of popular preferences. The public interest in privacy, however, is premised upon the individual's right to the pursuit of happiness. But we do not consider that question and do not rest this decision in any respect upon it. We assume, without deciding, for purposes of this case, that compulsion to answer the question asked by the Congressional Committee would impinge upon speech and not merely invade privacy."

■ But if a union officer exercises the constitutional right of refraining from saying whether he is a Communist, his union is forbidden the opportunity to enjoy the statutory benefit as long as he remains an officer. Unhampered is his freedom of speech and silence; he may freely choose to speak or not to speak. The "result that flows" from his silence, if he chooses that course, is the denial of a statutory privilege to his union. Neither the officer nor his union has a constitutional right to the advantage offered by the Act; consequently, if a union officer stands upon his freedom of speech and declines to execute the affidavit, it is his decision to remain silent which excludes his union. His voluntary act deprives his organization, not of a constitutional right, but of a statutorily created and extraordinary privilege. Thus again it seems indisputable that the non-Communist oath provision does no violence to a union officer's freedom of speech.

■■ Plaintiff further asserts that it and its members are deprived of liberty without due process of law, which is forbidden by the Fifth Amendment. Its theory is that liberty of association is diminished, if not destroyed, without due process, and also that the right peaceably to assemble or associate is denied, contrary also to the First Amendment. What has been said earlier in this opinion sufficiently shows, we think, that freedom of assembly is not infringed and that there is no deprivation of liberty of association without due process of law, or at all.

■ Plaintiff characterizes § 9(h) as a bill of attainder, a legislative act which inflicts punishment without a judicial trial. It is not punishment to withhold the grant of a privilege from one who cannot or will not meet the valid conditions upon which it is offered. Cf. Mr. Justice Frankfurter's concurring opinion in United State v. Lovett, 328 U.S. 303, 324, 66 S.Ct. 1073, 90 L.Ed. 1252.

■ It is insisted, however, that in practical working out, the affidavit is compulsorily required; that the freedom of a union officer to make or not to make it, according to his own choice, is illusory because the price of refusal is to see his union lose a valuable benefit, the loss of which causes virtual destruction of the organization. Without conceding the validity of the suggestion that through resultant economic pressure freedom of speech is impinged upon, but treating it as valid only for the purpose of the discussion, we proceed to consider whether free speech is thereby unconstitutionally restricted. For the guaranties of the First Amendment which protect most precious rights are in turn jealously guarded by the courts, and complaint that such rights have been impaired should never go unexamined.

Even if it be regarded that requiring the affidavit is an affirmative restriction upon freedom of speech, and not just a quest for information as in the Barsky case, i.e., if it be said that by exacting the affidavit Congress was acting instead of inquiring, it is still our view that the Barsky opinion has authority here. There the court was balancing the public interest against the private right, and found the former to outweigh the latter. Its express ruling was stated in this language: "We hold that in view of the representations to the Congress as to the nature, purposes and program of Communism and the Communist Party, and in view of the legislation proposed, pending and possible in respect to or premised upon that subject, and in view of the involvement of that subject in the foreign policy of the Government, Congress has power to make an inquiry of an individual which may elicit the answer that the witness is a believer in Communism or a member of the Communist Party."

The possibility that such an answer might be elicited was the reason Barsky said the inquiry violated his freedom of speech. It is the identical reason which is assigned by the plaintiff Union as a basis for asserting that § 9(h) abridges its officers' freedom of speech.

■ Pursuant to indubitable powers, Congress made it possible for a labor organization to enjoy the special privilege of exclusive representation, but conditioned the privilege in such a way that an inquiry must be administratively made of an individual which may elicit the answer that he is a member of the Communist Party or affiliated with it. We hold, just as the

United States Court of Appeals did in the Barsky case, that Congress has the power to require such an administrative inquiry, in view of the representations made to it as to the nature, purposes and program of Communism and the Communist Party, and in view of the recent history which it had before it of industrial unrest and strife provoked by Communists for their own political purposes.

The Court of Appeals took pains to limit its ruling to the power of Congress to inquire, as distinguished from its power to act. It said, "There is a vast difference between the necessities for inquiry and the necessities for action. The latter may be only when danger is clear and present, but the former is when danger is reasonably represented as potential." Properly understood, this means that the difference in the justification for inquiry and the justification for action lies in the proximity of danger, real or apparent.

Although we have concluded that freedom of speech is not abridged by § 9(h), for the purpose of further analyzing the problem here we shall now consider the statute as one affirmatively requiring a union officer to break his silence as to whether he is a Communist, thereby impinging upon his individual right to freedom of speech. Is the statute therefore unconstitutional?

It is fully established by reiterated holdings of the Supreme Court that the right of free speech is not absolute but must yield to national interests justifiably thought to be of larger importance. The same is true of the right to remain silent. When legislating to avert what it believes to be a threat of substantive evil to national welfare, Congress may abridge either freedom. The right to be silent may be interfered with in either of two ways: as an incident to the accomplishment of a legislative purpose, Congress may require an individual to make a statement specifically prescribed by it; or it may require generally that an individual make any statement essential to avert the anticipated evil, without defining the statement.

When, as here, the specific statement that he is not a Communist is required of an individual, the relation of the statement to the evil sought to be avoided, and the necessity that it be made, has been determined by the deliberations of Congress. On the other hand, if the statute provides that inquiry may be made, but does not describe the inquiry in express terms, an individual cannot be forced, in violation of his freedom of silence, to make a specific statement unless it appears that, without it, there is clear and present danger of the apprehended evil. It is only in the latter instance that the clear and present danger doctrine applies. This distinction is clearly shown in Gitlow v. New York, 268 U.S. 652, 670, 671, 45 S.Ct. 625, 69 L.Ed. 1138.

Clarification of the differentiation to which we have just referred is found in Bridges v. California, 314 U.S. 252, 260,[12] 62 S.Ct. 190, 192, 86 L.Ed. 192, 159 A.L.R. 1346. Paraphrasing the language of the Supreme Court shown in note 12, it can logically be said that here Congress has "appraised a particular kind of situation and found a specific danger sufficiently imminent to justify a restriction on a particular kind of utterance." That is to say, Congress here appraised the situation which exists when an exclusive bargaining union has an officer who is a Communist, and found in that situation the specific danger that such a union would subvert the bargaining process and incite industrial strife, and further found that specific danger to be "sufficiently imminent to justify a restriction" on the right of an officer of a union desiring the bargaining privilege not to reveal whether he is a

---

12 " * * * For here the legislature of California has not appraised a particular kind of situation and found a specific danger sufficiently imminent to justify a restriction on a particular kind of utterance. The judgments below, therefore, do not come to us encased in the armor wrought by prior legislative deliberation. Under such circumstances, this Court has said that 'it must necessarily be found, as an original question,' that the specified publications involved created 'such likelihood of bringing about the substantive evil as to deprive [them] of the constitutional protection.' Gitlow v. New York, 268 U.S. 652, 671, 45 S.Ct. 625, 631, 69 L.Ed. 1138."

Communist. That Congress did in fact make such an appraisal of the situation wherein a Communist is able to influence the bargaining process may be inferred from the mere fact that the statute was enacted;[13] and it is conclusively shown by the comments of members in House and Senate on the evidence to that effect heard by its committees. The statute therefore comes to us "encased in the armor wrought by prior legislative deliberation." That being true, it is not necessary for us, in order to sustain the statute, to find as an original proposition that the presence of a Communist in the exclusive bargaining process would create "such likelihood of bringing about the substantive evil" of industrial strife "as to deprive" the Communist "of the constitutional protection" to remain silent concerning his status as such.

In this connection, it should be noted that the plaintiff Union baldly challenges the statute as unconstitutional when applied to it; neither in the complaint nor in the argument is it asserted that there was no basis for the legislative discernment of resultant substantive evil should Communists be permitted to dominate or influence the exclusive bargaining procedure. The complaint challenges the validity of the statute on its face,[14] just as the demurrer did in the Carolene Products Company case quoted from in the footnote below. We may say here, as was said in that case, "it is evident from all the considerations presented to Congress, and those of which we may take judicial notice, that the question is at least debatable" whether Communists should be prohibited from being officers of exclusive bargaining unions. "As that decision was for Congress, neither the finding of a court arrived at by weighing the evidence, nor the verdict of a jury can be substituted for it."

Section 9(h) was adopted because Congress had concluded that the influence of Communists in the exclusive bargaining process is hurtful to the national interests. The debarment of them from that field is predicated on that conclusion. If it is a sound conclusion, then the incidental impairment of the Communist's right of silence is not unconstitutional. In order to challenge the constitutionality of § 9(h), a statute predicated on the existence of a particular state of facts, the challenger must show that that state of facts does not exist. Chastleton Corporation v. Sinclair, 264 U. S. 543, 44 S.Ct. 405, 68 L.Ed. 841; United States v. Carolene Products Company, supra, 304 U.S. at page 153, 58 S.Ct. 778. We have shown that in this case there is no such challenge but that, on the contrary, the statute is assailed as being unconstitutional on its face. But the abundant evidence upon which Congress acted, and the facts of current history which we judicially notice, sufficiently warranted the decision Congress made in that situation. We cannot sustain the claim that the Act is in itself unconstitutional. And it is not asserted that there was no danger of substantive evil from the source from which Congress foresaw it. Had that assertion been made, it would have been ineffective because, as will appear later in this opinion, there was proof of such danger.

From the foregoing it may be seen our opinion is that this is a case in which the clear and present danger doctrine does not apply, because of the distinction between two different sorts of speech-infringing statutes pointed out in Gitlow v. New York, supra. But, in order that the situation may be fully explored, we proceed now to consider this case as though it were one of the

---

13 " * * * the inferences as to the legislature's appraisal of the danger arise from the enactment, * * * ." Bridges v. California, supra, 314 U.S. at page 261, n. 3, 62 S.Ct. at page 193.

14 In United States v. Carolene Products Company, 304 U.S. 144 at 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234, the Supreme Court said: " * * * Here the demurrer challenges the validity of the statute on its face and it is evident from all the considerations presented to Congress, and those of which we may take judicial notice, that the question is at least debatable whether commerce in filled milk should be left unregulated, or in some measure restricted, or wholly prohibited. As that decision was for Congress, neither the finding of a court arrived at by weighing the evidence, nor the verdict of a jury can be substituted for it."

class to which the clear and present danger doctrine does apply, and to see if the Act in question meets the test of that rule. Abridgment of free speech by a statute of that class is permissible only if the factual situation in which Congress acted showed the "clear and present danger" which the Supreme Court has often said is the only warrant for restricting basic individual rights. For example, Mr. Justice Rutledge said in Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430, " * * * any attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger." So our question is: was Congress justified in envisaging clear and present danger to the national interest if the exclusive bargaining privilege were extended to unions whose officers are members of the Communist Party or affiliated with it?

The opinion of the Supreme Court in Thomas v. Collins, supra, contains an illuminating discussion of the "clear and present danger" rule and the manner of its application. Courts must say where the individual's freedom ends and the power of government begins. The First Amendment gives to the freedoms which it secures a sanctity which does not permit of dubious intrusion. Mr. Justice Rutledge wrote in that opinion, 323 U.S. at page 531, 65 S.Ct. at page 323: " * * * Where the line shall be placed in a particular application rests, not on * * * generalities, but on the concrete clash of particular interests and the community's relative evaluation both of them and of how the one will be affected by the specific restriction, the other by its absence. That judgment in the first instance is for the legislative body."
He went on to say that where the line can constitutionally be placed presents a question which the Supreme Court cannot escape answering independently, whatever the legislative judgment. And under our constitutional tradition, the answer "can be affirmative, to support an intrusion upon this domain, only if grave and impending public danger requires this."

When clear and present danger exists, or when "danger is reasonably represented as potential" so that inquiry is justified as in the Barsky case, must somehow be determined; and it will not be often, if ever, that the presence of potential danger, or clear and present danger, can be conclusively demonstrated until the portended harm has been done. Usually the existence of either is a matter of opinion, and it is for the legislative body to form that opinion in the first instance. Congress must decide whether clear and present danger to a national interest exists, and, if so, must determine upon a way to avert it. If the method chosen intrudes upon an individual right guaranteed by the First Amendment, Congress must evaluate the clashing public and private interests, must note how the one will be affected by the restriction, the other by its absence, and must then decide whether to impose the restriction. We take it that the congressional judgment is final unless there was in fact no clear and present danger, which alone justifies impinging upon sacred individual rights.

In this case Congress must have seen what it considered clear and present danger to the body politic in permitting Communists to be dominant in exclusive bargaining agencies; for Congress is, of course, aware of the long established clear and present danger rule and knew that it could abridge the freedom of speech, even if merely to a slight degree, only for the larger purpose of averting such danger.

What information did Congress have that there was clear and present danger that required the action taken? It had before it evidence of instances in which strikes have been called, for political reasons only, through the influence of Communists in unions. That this is true is a matter of general knowledge. "Many a U. S. strike has been fomented by Communists," said Time Magazine in its issue of March 22, 1948, p. 22, col. 3. It knew that one of the purposes of the Communist Party is to destroy democratic institutions and that infiltration into labor unions is one of the first steps in the process. In addition to proof of overt acts, it had before it opinions as to the nature and purposes of the Communist Party from persons in position to have knowledge of the subject. Typical of these is the statement by William Green, president of the American Federation of

Labor, that "A Communist is sworn to overthrow our Government";[15] and the following by Walter W. Cenerazzo, national president of the American Watch Workers Union:[16] "Examine an industry that has trouble and in most cases you will find the employer has not accepted the union and the union is fighting for its existence. The only exception to this are those Communist-controlled unions which desire to wreck our economic system. These must be eliminated from American life by law if we are to maintain a Republic in these United States."

Congress had also the opinion of the Chief Executive that Communists threaten our national security. As was noted by the Court of Appeals in the Barsky opinion, "The President, * * * has announced to the Congress the conclusion that aggressive tendencies of totalitarian regimes imposed on free peoples threaten the security of the United States, and he mentioned the activities of Communists in that connection." The reference was to the Message of March 12, 1947, H.R.Doc. No. 171, 80th Cong., 1st Sess., 93 Cong.Rec. 1999–2000.

Acting on the ample information before it, Congress decided that it was more important for exclusive bargaining agencies to be free of subversive influence than it was for their officers who are Communists to be free to refrain from stating their status as such. Thus the enactment was based "on the concrete clash of particular interests and the community's relative evaluation both of them and how the one will be affected by the specific restriction, the other by its absence."

Was Congress mistaken in thinking there was clear and present danger? As has been shown, it is first the duty of the legislative body to decide whether there exists such imminent danger to national interests as to justify impairing an individual freedom in order to avert it. At what point public safety overrides individual freedom of speech,—where the line can constitutionally be placed—presents a question which, in Thomas v. Collins, supra, the Supreme Court said it cannot escape answering independently whatever the legislative judgment. Nor can we escape it. But in answering independently we must give weight, we think, to the strong presumption of constitutional validity which accompanies the judgment of Congress, and we are not authorized to disturb that judgment unless we are firmly of the opinion that a clear and present danger did not exist.

In considering the matter we have before us the same evidence and information which Congress had in forming its judgment. If that were all, we would not be prepared to say that Congress was wrong in seeing danger and in thinking it clear and present. But we have much more than that. We judicially know the facts of current history and cannot close our eyes to them and to their significance. Events on the national and world stages since the Taft-Hartley Act became law on June 23, 1947, have not removed the basis which the Congress then had for deciding that Communistic influence in labor relations was a clear and then present danger to the national welfare and security. Those events have, on the contrary, emphasized the ground for alarm which Congress felt. The President has not changed the views which he expressed in his Message of March 12, 1947, but apparently finds them intensified by recent developments in Europe. In the Message delivered March 17, 1948, he said:[17] "The tragic death of the Republic of Czechoslovakia has sent a shock throughout the civilized world. Now pressure is being brought to bear on Finland, to the hazard of the entire Scandinavian peninsula. Greece is 'under direct military attack from rebels actively supported by her Communist-dominated neighbors. In Italy, a determined and

---

[15] Hearings before Committee on Labor and Public Welfare on S. 55 and S. J.Res. 22, 80th Cong., 1st Sess. 1001 (1947).

Mr. Green is also quoted as having said, in an address at Georgetown University on April 2, 1948: "The first step of the Communist design is the capture of labor." The Washington Post, April 3, 1948, p. 2B, col. 1.

[16] Hearings before Committee on Labor and Public Welfare on S. 55 and S.J.Res. 22, 80th Cong., 1st Sess. 1590 (1947).

[17] 94 Cong. Rec. 3084 (March 17, 1948), 80th Cong., 2nd Sess.

aggressive effort is being made by a Communist minority to take control of that country. The methods vary, but the pattern is all too clear."

He later added:[18] "* * * so long as communism threatens the very existence of democracy, the United States must remain strong enough to support those countries of Europe which are threatened with Communist control and police-state rule."

Curiously enough, Joseph Curran, the president of the plaintiff Union and himself nominally a plaintiff here, views with as much alarm as did Congress the influence of Communists in labor organizations. Writing in the plaintiff's publication in the latter part of 1947 just a few weeks before this suit was filed, he said of the efforts of Communists in the plaintiff Union to gain control of its convention, "It is a fight by the Communists to either control our Union or destroy it. Nothing less."[19] In a later issue of the same publication he said of the Communist delegates:[20] "They came to the convention fully instructed and with a program directed by the highest chiefs in the Communist Party, although many of these delegates to the convention were instructed by you, the membership, to vote for policies and programs which would stop interference from the outside and which would return the Union to the rank and file. They had as their major purpose protecting the closed shop in our Union of the Communist Party. These party delegates proved beyond a shadow of a doubt that they represented NOT the membership of the NMU, but belonged body and soul to the Communist Party."

We regard statements like those of the President and Mr. Curran as expressive of the community's very recent evaluation of the danger which Congress foresaw in 1947.

██ If the objection be made that the statute is unconstitutional because the Communist Party has been singled out by name, we are sustained by the fact that the sovereign may impose the test of fitness. If the Communist Party had not been mentioned by name, a member of the Communist Party still could probably not be an officer of a sole bargaining agent, because he still would be a member of a group teaching the overthrow of the government by force. It is plain from the statute that the prohibition in its essence is against those persons who belong to societies which teach or advocate the overthrow of the government by force or violence or illegal means. Congress had evidence before it from which it could well conclude that the Communist Party is such a society; and having so determined, it is not for this court to retry that issue. As said in Patsone v. Pennsylvania, 232 U.S. 138, 144, 34 S.Ct. 281, 58 L.Ed. 539, and reiterated in Bryant v. Zimmerman, 278 U.S. 63, 73, 49 S.Ct. 61, 65, 73 L.Ed. 184, 62 A.L.R. 785: "* * * But we start with the general consideration that a state may classify with reference to the evil to be prevented, and that if the class discriminated against is or reasonably might be considered to define those from whom the evil mainly is to be feared, it properly may be picked out. A lack of abstract symmetry does not matter. The question is a practical one, dependent upon experience. The demand for symmetry ignores the specific difference that experience is supposed to have shown to mark the class. It is not enough to invalidate the law that others may do the same thing and go unpunished, if, as a matter of fact, it is found that the danger is characteristic of the class named."

██ The opinion of the Supreme Court in Bryant v. Zimmerman, supra, is instructive in this connection. There the Court had under consideration a New York statute which made it a misdemeanor for one to become or remain a member of, or to attend a meeting of, any association of twenty or more which required an oath as a condition of membership and which had not filed with the Secretary of State its constitution, bylaws, rules, regulations, and oath of membership, together with a roster of members and a list of officers. Labor unions and benevolent orders mentioned in the benevolent orders law were excepted.

Bryant was convicted of being a member of and of attending meetings of the Ku

---

[18] Ibid.
[19] NMU Pilot, October 10, 1947, p. 2, cols. 2–3.

[20] NMU Pilot, October 24, 1947, p. 2, col. 2.

Klux Klan, an organization which had not complied with the requirements of the statute. He contended that under the due process clause the statute deprived him of liberty in preventing him from exercising his right of membership in the association. "But his liberty in this regard," said the Supreme Court, "like most other personal rights, must yield to the rightful exertion of the police power." It is, of course, true that Congress has general authority to adopt legislation designed to promote the welfare of the nation and its people which is similar to the police power of a state.

The exception of labor unions and benevolent orders was the basis of Bryant's claim that the statute was invalid under the equal protection clause. In disposing of that contention the Court said, 278 U.S. at pages 76, 77, 49 S.Ct. at page 66:

"We assume that the legislature had before it such information as was readily available, including the published report of a hearing before a committee of the House of Representatives of the Fifty-Seventh Congress relating to the formation, purposes and activities of the Ku Klux Klan. If so, it was advised—putting aside controverted evidence—that the order was a revival of the Ku Klux Klan of an earlier time, with additional features borrowed from the Know Nothing and the A. P. A. orders of other periods; that its membership was limited to nativeborn, gentile, protestant whites; that in part of its constitution and printed creed it proclaimed the widest freedom for all and full adherence to the Constitution of the United States, in another exacted of its members an oath to shield and preserve 'white supremacy,' and in still another declared any person actively opposing its principles to be 'a dangerous ingredient in the body politic of our country and an enemy to the weal of our national commonwealth'; that it was conducting a crusade against Catholics, Jews, and Negroes and stimulating hurtful religious and race prejudices; that it was striving for political power and assuming a sort of guardianship over the administration of local, state and national affairs; and that at times it was taking into its own hands the punishment of what some of its members conceived to be crimes.

"We think it plain that the action of the courts below in holding that there was a real and substantial basis for the distinction made between the two sets of associations or orders was right and should not be disturbed."

Actualities are ignored when it is contended that a Communist may be without a purpose to create unrest and disturbances in a democracy. The Communist Party is known to be organized for the purpose of promoting throughout the world a program to spread communism. This program is its primary objective, to which all else must yield. The pattern followed, demonstrated by statements of its leaders, and even more convincingly by acts of its members, is to create economic unrest in a democracy; to encourage and promote strikes, wherever possible, for by such agitation, democracies will become unpopular and communism will take their place. Evidence in a judicial proceeding is not needed to establish these as primary objectives. The pages of history within late years establish them beyond the power of successful contradiction. To combat the Communist program, Congress, at the request of the President, is even now in the course of appropriating billions of dollars. If a member of the Communist Party is ignorant of its aims, his ignorance is enough to disqualify him for a responsible post. If he is aware of the aims of the Party, his enmity to them is obviously too weak to compel him to forego association with a group pursuing those aims.

This court is asked to strike down as unconstitutional an arm of protection raised by Congress against an assault upon our form of government which the Constitution was provided to secure. As was said by Mr. Justice Clark, in Milwaukee Publishing Company v. Burleson, 255 U.S. 407, 414, 41 S.Ct. 352, 355, 65 L.Ed. 704: " * * * The Constitution was adopted to preserve our government, not to serve as a protecting screen for those who, while claiming its privileges, seek to destroy it."

It would be strange indeed if, when an aggressive foreign nation presently imperils economies of nations throughout the world in an effort to destroy democracy, we should demand further evidence whether those committed to the Communist program would

seek to imperil the economy of the United States, the most efficient democracy in the world.

In view of the avowed purpose of both the Wagner Act and the Taft-Hartley Act to bring about a *peaceful* solution of labor quarrels, and the discernible purpose of the Communist Party to foment strikes and industrial disorders, Congress could well conclude that persons occupying key positions in the administration of labor laws should not be subject to conflicting loyalties or interests. Congress not only may, but often does, legislate against just such temptations. Thus, in United States v. Dietrich, 126 F. 671, Mr. Justice Van Devanter (then circuit judge), in explaining the purpose of the legislation prohibiting Congressmen from holding any interests in contracts with the United States, said, 126 F. at page 673: "* * * The purpose of the statute is to effectually *close the door to the temptation* which is incident to contractual relations between the government and members of Congress." (Emphasis supplied.)

Other examples of legislation against temptation are the prohibition against directorship on two banks in the Federal Reserve System, 15 U.S.C.A. § 19; against interlocking directorates between utilities and underwriters, 16 U.S.C.A. § 825d and between banks and underwriters, 12 U.S.C.A. § 78.

At this point we find language in the Barsky opinion which is equally applicable here. The Court of Appeals noticed Barsky's argument ·that since an answer that the witness is a Communist would subject him to embarrassment and damage, the asking of the question is an unconstitutional burden on free speech. The court then said: "* * * We proceed upon the theory that even the most timid and sensitive cannot be unconstitutionally restrained in the freedom of his thought. But this consideration does not solve the problem, because the problem is the relative necessity of the public interest as against the private rights. Even assuming private rights of the timid to be of the fullest weight, the problem remains whether they outweight the public necessities in this matter. That the protection of private rights upon occasion involves an invasion of those rights is in theory a paradox but, in the world as it happens to be, is a realistic problem requiring a practical answer. That invasion should never occur except upon necessity, but unless democratic government (by which we mean government premised upon individual human rights) can protect itself by means commensurate with danger, it is doomed. That it cannot do so is the hope of its opponents, the query of its skeptics, the fear of its supporters."

We have no sort of doubt that the United States government can protect itself against threats to its national economy which its Congress, with reasonable basis, regards as imminent; and that the Constitution does not require it to lend opportunity to those who desire to interfere with the vital flow of interstate commerce by affording them the protection of one of the basic individual freedoms which they seek to destroy. That would be paradoxical indeed. Self-preservation being the first law of nature, man has the right to defend himself against what he has a reasonable basis to apprehend as imminent danger. It would be strange if government could not do as much. Congress took a step in that direction in adopting § 9(h) after it had painstakingly made the community's relative evaluation of conflicting interests, to which Mr. Justice Rutledge referred.

Among the classic statements made by Mr. Justice Holmes is that freedom of speech does not permit a man falsely to shout "Fire!" in a crowded theatre. We may extend the thought by suggesting that a man who is isolated from his fellows probably could not be required by law to say whether he has a contagious disease. But if he should seek admission to a crowded theatre, he could not decline to answer on constitutional grounds. Admission is sought here to the arena of exclusive bargaining in which the conduct of the agent will affect not only the rights of its members and all other employees, but the interests of the public too. Accordingly, having with good reason diagnosed Communism as a contagion which is deleterious to labor relations, Congress has the power to ask a prospective bargaining agent whether he is so afflicted.

172

The views which we have expressed are not prohibited, as we think, by Schneiderman v. United States, 320 U.S. 118, 63 S. Ct. 1333, 87 L.Ed. 1796, and Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1443, 1447, 89 L.Ed. 2103, relied upon by the plaintiff. Those cases may be readily distinguished from this one, and expressions taken from their context in the opinions do not control in the situation which we have. In each of the cited cases the government was seeking direct results highly punitive in character; in one, the government's purpose was to set aside a judgment entered twelve years before, and in the other, it was to deport an alien immigrant who had resided in this country for many years. In the Schneiderman case the Court was careful to distinguish the situation there presented from one in which a privilege is sought. The Supreme Court merely prescribed in those cases the degree of proof required in such highly penal proceedings.

Finally, we consider the plaintiff's contention that "The statute does not establish ascertainable standards of conduct; its language is vague and indefinite." The difficulty which the Supreme Court experienced in defining the word "affiliation" is cited in support of that charge against the statute. It was in Bridges v. Wixon, supra, that the Court found definition difficult and concluded that affiliation "imports, * * * less than membership but more than sympathy."

In that case it was necessary to ascertain from extrinsic evidence whether Bridges was "affiliated". In the present case, there is no such necessity. A union official is simply asked to say whether he is "affiliated"; i. e., whether he considers himself as affiliated. We may safely assume that any man intelligent and schooled enough to be chosen as a union official will be familiar with the word "affiliated" and will have a definite idea of its meaning. His notion of the word's significance may not coincide with that of another, and may not be what a dictionary gives. But he is not called upon to define "affiliated" in his affidavit. He is asked to say whether he considers himself affiliated in the sense in which that word has significance to him. There is no vagueness or uncertainty in his own personal definition. The other statutory words said to be too indefinite appear in that portion of the statute which asks whether the witness believes in the violent overthrow of government,—a portion which is not under plaintiff's attack.

Consideration of other principles not stressed by either the plaintiff Union or the defendants leads inevitably to the conclusion that the constitutionality of the statute must be sustained. The plaintiff assumes that the privileges accorded the sole bargaining agent are proprietary in their nature and the defendants themselves likewise discuss the qualifications to the privileges accorded the unions, the sole bargaining agents, as though the functions of the sole bargaining agent were proprietary in character. Quite to the contrary, we find the rights and duties given to the sole bargaining agent to be highly fiduciary. An exclusive bargaining agent occupies a position of public interest similar to that of a government officer. Judge Prettyman's dissenting opinion aptly refers to exclusive bargaining representation as "an operating participation in governmental facilities."

The Supreme Court, in J. I. Case v. National Labor Relations Board, 321 U. S. 332, 335, 64 S.Ct. 576, 579, 88 L.Ed. 762, describes the contract worked out by an exclusive bargaining agent as follows: " * * * the agreement may be likened to the *tariffs established by a carrier, to standard provisions prescribed by supervising authorities for insurance policies, or to utility schedules of rates and rules for service,* which do not of themselves establish any relationships but which do govern the terms of the shipper or insurer or customer relationship whenever and with whomever it may be established. Indeed, in some European countries, contrary to American practice, the terms of a collectively negotiated trade agreement are submitted to a government department and *if approved become a governmental regulation ruling employment in the unit.*" (Emphasis supplied.)

As to the relative position of the contract made by a collective bargaining agent and one of the individual employees under the

Wagner Act, the Supreme Court said, 321 U.S. at page 339, 64 S.Ct. at page 581: " * * * We cannot except individual contracts generally from the operation of collective ones because some may be more individually advantageous. Individual contracts cannot subtract from collective ones, and whether under some circumstances they may add to them in matters covered by the collective bargain, we leave to be determined by appropriate forums under the laws of contracts applicable, and to the Labor Board if they constitute unfair labor practices."

The Supreme Court has described the powers of a statutory bargaining agent, Steele v. Louisville & Nashville Railroad Company, 323 U.S. 192, 198, 65 S.Ct. 226, 230, 89 L.Ed. 173, in the following language: " * * * For the representative is clothed with power *not unlike that of a legislature* which is subject to constitutional limitations on its power to deny, restrict, destroy or discriminate against the rights of those for whom it legislates and which is also under an affirmative constitutional duty equally to protect those rights." (Emphasis supplied.)

In Wallace v. National Labor Relations Board, 323 U.S. 248, 255, 65 S.Ct. 238, 241, 89 L.Ed. 216, the Court further described the duties of a bargaining agent: "The duties of a bargaining agent selected under the terms of the Act extend beyond the mere representation of the interests of its own group members. By its selection as bargaining representative, *it has become the agent of all the employees, charged with the responsibility of representing their interests fairly and impartially.*" (Emphasis supplied.)

It is too well known to require citation of authority that the sovereign may regulate activities charged with a public interest, and may prescribe the qualifications of the persons engaged in those activities. A fortiori, the qualifications of a person exercising quasi governmental functions may be prescribed by the sovereign. Congress clearly has the right to assure the minority of the workers, who are represented against their choice by the agent, and the employer, who must deal with the agent to the exclusion of others,

that the agent possesses minimum qualifications for the post. It is not necessary that the government, in order to ask whether the prospective agent is qualified, show a clear and present danger to the national economy from selecting one not qualified.

Moreover, those who engage in such activities find that rights which are guaranteed by the Constitution to a private citizen do not prevent the government from determining their fitness to be fiduciaries or from restricting their actions as such. Thus the physician, the attorney, and in some jurisdictions the clergyman, is limited in his right of free speech in that he is prevented from disclosing facts given to him in professional confidence.

Probably the best known example is that presented in Hawker v. New York, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002. In that case Hawker had been convicted of a felony and had satisfied his sentence. Thereafter, the State of New York enacted a statute which prohibited the practice of medicine by one convicted of a felony. Hawker contested the constitutionality of the statute on the ground that the statute was ex post facto and a bill of attainder as to him. The Supreme Court, in rejecting his contention, held that it was within the power of the State to prescribe the qualifications for physicians, and to make character a test of that qualification. It laid down the rule, since universally followed, that if the sovereign may require good character as a condition of practising a profession or a trade charged with a public interest, it may rightfully determine what may be evidence of character, and may say that a previous criminal conviction is such evidence.

Likewise, the Supreme Court in Semler v. Board of Examiners, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086, upheld the constitutionality of regulations prohibiting dentists from advertising by billboards and other means likely to attract the attention of the public, even though the representations in such advertisements might be true. Our own Court of Appeals sustained the suspension of a dentist for a like cause. Johnston v. Board of Dental Examiners, 77 U.S.App.D.C. 119, 134 F.2d 9. A dentist has

as much right to free speech as has an exclusive bargaining agent.

Moreover, political beliefs may disqualify one from following a calling if the beliefs are such as to render him, in the view of the sovereign, unfit. In the case of In Re Summers, 325 U.S. 561, 65 S.Ct. 1307, 89 L.Ed. 1795, Summers had passed the examination for admission to practice law in the State of Illinois. The sole reason for denying him the right to practice was that he had conscientious scruples about participation in war. He was, therefore, unable to take in good faith a required oath to support the Constitution of Illinois. The Court upheld his exclusion from the practice. It is noteworthy that Summers' actions were merely passive. He was unwilling to promise in effect that he would perform military service if called. The Taft-Hartley Act, instead of requiring a positive showing of attachment to the principles of our government and a willingness to defend it, merely requires evidence that those who act as exclusive bargaining agents are not *actively* opposed to those principles.

■ We shall briefly consider the dissenting opinion filed herewith. Some of the differences between us are minor in character. For example, it is said in dissent, "The strong presumption of constitutionality which attaches to an act of Congress challenged for lack of power under one of the delegations of power, does not attach to an act challenged as violative of the prohibitions of the First Amendment." In support of the statement West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674, and United States v. Carolene Products Company, 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234, are cited. We do not read either decision as so holding. The Carolene Products opinion, to the contrary, remarks that, 304 U.S. at page 152, 58 S.Ct. at page 783: " * * * the existence of facts supporting the legislative judgment is to be presumed, for regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon

some rational basis within the knowledge and experience of the legislators."

At that point in the Supreme Court's opinion, it is said in a footnote, "There may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten Amendments, * * *." To say that its scope of operation in such circumstances may be narrower than otherwise, is not to say that the presumption of constitutionality does not attach at all. The continuance of the presumption of validity is expressly recognized in Thomas v. Collins, supra, 323 U.S. at pages 529, 530, 65 S.Ct. at page 322, where it was said: "The case confronts us again with the duty our system places on this Court to say where the individual's freedom ends and the State's power begins. Choice on that border, now as always delicate, is perhaps more so where the usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment."

Thus the Court said, not that the presumption of constitutional validity is absent when the First Amendment is present, but that it is balanced by it. When, as here, Congress finds impending danger to national interests which justifies restraint of an individual freedom of silence, the presumption of constitutional validity, no longer balanced by the First Amendment, continues in full vigor.

The principal point of divergence between us arises from the view in the dissenting opinion "that when an act of Congress abridges freedom of speech, press and assembly, the court itself, by an independent examination and upon evidence presented to it, must determine the actuality of the necessity for the abridgment." The dissent confesses, however, that no case has been found where the Supreme Court "has said that when Congress has made a conclusion of fact upon which the constitutionality of an act depends, the courts must take evidence upon those facts. But it seems to me that such must be the rule." We are convinced that there is no

such case. Many decisions indicate to the contrary.[21]

■■■ A legislative statement of fact may be challenged as being wholly without foundation, in which event a court will examine the evidence which the legislative body had, to see if the conclusion of fact actually was without basis; but it will not try the issue of fact de novo. In dealing with statutes which fall into the second of the two classes described in Gitlow v. New York, that is, enactments which do not contain within their own terms the conclusion of fact which is attacked as making their application unconstitutional, obviously the court must hear evidence in order to determine whether such an enactment can be applied in the circumstances. That is not, however, a de novo reexamination of a legislative determination of fact. The case before us falls in the first category mentioned in the Gitlow case, in that Congress determined, and by enacting the statute said, that industrial peace will be disturbed by Communists in places of bargaining authority. If we should undertake to hear evidence on the validity of that determination, we would be asserting the power to substitute our judgment for that of the Congress. Courts do not have that power. Their function ends when they have found whether Congress had a substantial basis for its conclusion.

Moreover, the Supreme Court has said, "When a statute is assailed as unconstitutional we are bound to assume the existence of any state of facts, which would sustain the statute in whole or in part." Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 465, 65 S.Ct. 1384, 1392, 89 L.Ed. 1725. See also Metropolitan Casualty Insurance Company v. Brownell, 294 U.S. 580, 584, 55 S.Ct. 538, 79 L.Ed. 1070, and cases cited; and United States v. Carolene Products Company, supra, 304 U.S. at pages 152, 153, 58 S.Ct. 778.

■■ It follows that we cannot agree with the theory of the dissent that the only way of determining whether Congress was justified in seeing a clear and present danger is by the means afforded for judicial determination of issues of fact formed by the pleadings of litigants. This case is being considered on the defendants' motion to dismiss, which necessarily concedes all the facts well pleaded in the complaint. The question is one of law, not of fact; and, as we have seen, the complaint is devoid of any allegation that there was no evidence to justify the legislative apprehension of clear and present danger. Had such an averment been made, its effect would have been no more than to require us to examine the information which Congress had, in order to ascertain whether it was sufficient to justify the legislative action.

As a matter of fact, however, despite the absence from the complaint of an allegation that Congress acted without supporting information, we have examined into that question, as appears heretofore in this opinion. The transcript of the Senate committee hearings exceeds 2,400 pages in length. That of the House committee hearings contains more than 3,800 pages. The reports of committees, the debates, speeches, and the veto message of the President fill two volumes aggregating 1,680 pages.

■ In all this voluminous matter there is ample evidence which justified Congress in concluding that a clear and present danger to industrial peace would exist unless Communists were excluded from labor negotiations. Some of that evidence we have discussed already. A few further references to it will serve to emphasize the correctness of the congressional conclusion. Lewis F. Budenz, former editor of the Daily Worker, who was for six years a member of the National Committee of the Communist Party, was a witness before the House committee. He said:[22] " * * *

21 Gitlow v. New York, 268 U.S. 652, 671, 45 S.Ct. 625, 69 L.Ed. 1138; Bryant v. Zimmerman, 278 U.S. 63, 76, 49 S.Ct. 61, 73 L.Ed. 184, 62 A.L.R. 785; United States v. Carolene Products Co., 304 U.S. 144, 151, 58 S.Ct. 778, 82 L.Ed. 1234; Bridges v. California, 314 U.S. 252, 260, 261, 62 S.Ct. 190 86 L.Ed. 192, 159 A.L.R. 1346.

22 Hearings before Committee on Education and Labor of the House of Representatives on Bills to Amend and Repeal the National Labor Relations Act and For Other Purposes, 80th Cong., 1st Sess. 3608 (1947).

176

At that time, (i. e. 1940) I might say, after the Hitler-Stalin pact, that the Communist Party, of course, in every issue of every publication declared itself against Great Britain, declared itself against President Roosevelt as a Fascist, and, likewise, defended Hitler as an evangel of peace; that is, saying that Hitler's peace proposal was genuine at that time. Following that up, of course, they also suddenly found a tremendous interest in the possibilities of wage rises *and strikes and had a whole campaign in regard to strikes* in the various Communist publications."

Again in his testimony the following colloquies appeared:[23]

"Mr. Kersten. Can you state whether or not, up until the time you left the Communist Party, the technique of strikes was an important technique in bringing about communism or Communist control?

"Mr. Budenz. Well, it is under certain circumstances; that is to say, strikes are hit upon as a technique when Moscow wants that sort of a policy to be carried out. *You understand that the Communist Party is only a fifth column for the Soviet Union and nothing else.*

\* \* \* \* \* \*

"Mr. Kersten. Hypothetically, let me put this question to you: If a member of the Communist Party in this country received an order from Moscow with regard to a certain situation, and the Government of this country, let us say the President of the United States, made an order pertaining to the same subject but the order was exactly the opposite of the Moscow order, can you state, from your knowledge of the Communist Party, what the obligation of the member, the Communist Party member in this country, would be as to which order he should or would have to follow?

"Mr. Budenz. *I can state from my knowledge and from my experience he would have no option but to follow the orders from Moscow."* (Emphasis supplied.)

Mr. Budenz was not the only witness who testified at length on the Allis-Chalmers and the North American Aviation strikes. He was joined by others in demonstrating that both strikes followed the Party line and were on Party orders.

While we have reviewed and evaluated the evidence presented to the congressional committees regardless of the fact that the complaint does not allege its insufficiency to support the legislation, we think it would be manifestly incorrect and improper to investigate independently, through the hearing of evidence de novo, the question whether there was in fact the clear and present danger which Congress saw. That is what the dissent indicates to be proper. There is no such allegation in the complaint and, if there were, it is our considered view that it could not properly tender that issue.

There are other difficulties inherent in the dissenting view which directly demonstrate that its suggested procedure should not be adopted. If this court should hear evidence and make a finding of fact that there was no clear and present danger and, therefore, brand the Act as unconstitutional; and if another district court in another circuit should hear evidence in a case between another union and the defendant Board, and should find as a fact that there was a clear and present danger and, therefore, hold the Act to be constitutional; what would be the procedure of the Supreme Court when both cases came before it? Would it disregard the evidence which Congress had and dispose of the constitutional question on the basis of a district court's finding of fact regarding the existence of clear and present danger? If the latter, which court's finding would it adopt; or would the theory expect the Supreme Court to disregard the evidence before Congress and before the district courts and itself hear evidence? Such considerations seem to us conclusively to demonstrate the soundness of our position.

Another fundamental difference between us is revealed by this statement in the dissent: "Thus, a requirement as to political belief, imposed upon the use of a facility, is not a mere condition upon a privilege; it is, in fact, an abridgment of political belief." We have sufficiently dem-

---

[23] Id. at 3614.

onstrated, we think, that the requirement of the non-Communist affidavit is nothing more than a condition attached to the grant of a privilege.

Instead of being convinced beyond reasonable doubt that § 9(h) of the statute is void for violating the basic law, we hold the considered view that the subsection is a constitutional exercise of congressional power to prescribe qualifications which must be possessed by those who ask to enjoy the extraordinary privilege of acting as exclusive bargaining agent. It would be unrealistic to say, in the light of all that appears, that the presence of Communists in key positions in labor relations does not constitute a clearly discernible and imminent threat to important national interests. Since we are of the opinion that all three provisions of the statute assailed by the plaintiff were enacted and may be enforced without offense to the Constitution, we shall dismiss the complaint.

PRETTYMAN, Associate Justice (dissenting).

I think that the motions to dismiss and for summary judgment should be denied and that evidence should be taken upon the question of fact raised by one of the constitutional issues. That issue is the validity of the clause of Section 9(h) of the Act which provides that the facilities of the Board shall not be available to a labor organization unless each of its officers swears "that he is not a member of the Communist Party or affiliated with such party". The question of fact is whether the nature of the Communist Party is such that a member of it would, or would likely, impede the objectives of the Act.

The court is of the view that the conclusions of Congress must be accepted if the test itself bears a reasonable relation to the legislative purpose, and that the finding of constitutionality may be made upon evidence taken by committees of the Congress and "facts of current history" of which the court will take judicial notice. I am of the view that when an act of Congress abridges freedom of speech, press and assembly, the court itself, by an independent examination and upon evidence presented to it, must determine the actuality of the necessity for the abridgment.

I shall not delay the promulgation of the decision in order to prepare an exhaustive discussion of the pertinent authorities, but will merely mention enough of them to indicate the bases of my view.

I. Some preliminary observations must be made. I agree with the majority of the court in regard to Sections 9(f) and 9(g) of the Act, which require labor unions to file financial statements. Similar provisions have long applied to newspapers and other publications. I agree in regard to the last clause of Section 9(h), which refers to persons and organizations which advocate the overthrow of the Government by force or illegal methods. Advocacy of such measures is so extreme that it could not be an inconspicuous or incidental part of a general program. Therefore, persons belonging to or believing in such an organization can properly be charged personally with that purpose, to the extent that they can be denied an operating participation in governmental facilities. We are not here concerned with criminal guilt.

I agree with the result reached by the court in the rulings upon the standing to sue of the individual plaintiffs. I have no doubt as to the standing of the plaintiff Union to sue for a declaratory judgment. The question posed by Section 9(h) is not merely a failure of certification (see Switchmen's Union v. National Mediation Board, 1943, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61, but is a total denial to the Union of the use of the facilities created by the National Labor Relations Act. The Union has a direct interest which entitles it to sue.

I have fully in mind what was said in Barsky v. United States.[1] That opinion related to the power of inquiry, and to that alone. It was emphatic in that limitation. It cautioned that there is a vast difference between the necessities for congressional inquiry into a subject or situation and the necessities for legislative action which abridges the freedoms protected by the prohibitory Amendment. The former necessities were before the court in that case; the

---

[1] 1948, 83 U.S.App.D.C. —, 167 F.2d 241.

latter are in part before us now. The court held in the Barsky case that a respectable representation to the Congress of a potential menace to the nation is sufficient warrant for inquiry into the subject. No such rule applies to action, as the court there carefully pointed out and as the Supreme Court has held many times. Inquiry may be justified when danger is merely potential; danger must be factually real to justify action. Inquiry may be justified when danger is represented to the Congress by respectable authority; the danger must exist to justify action. In my present view I do not depart from a single statement in the Barsky opinion. I move from that problem to this one, in the light of what was said there.

The great question as to how a democracy can protect itself in an internal conflict of ideas and at the same time preserve the individual rights of free speech, press and assembly, cannot be solved by a single all-embracing declaration of condemnation of noxious doctrine. Neither, on the other hand, can it be solved by unqualified affirmations of the right to say and print what one pleases at all times and under all circumstances. The problem is composed of parts. The congressional power of inquiry is one part. The constitutional power to limit statutory civil privileges is another part. There are still other parts. It is elementary by now that Congress cannot condemn, prohibit, or even regulate everything as to which it may inquire, and that it may not prohibit under all circumstances everything which it may prohibit under some circumstances.

II. The answer to the question posed by the case at bar follows from three propositions.

A. The restriction contained in the clause of the statute under discussion is an abridgment of free speech, press and assembly.

Political belief, speech and organization are among the forms of speech, press and assembly protected against governmental interference by the First Amendment. Indeed, freedom of political thought was the prime objective for which those particular clauses of the Amendment were fashioned. To condemn or to interdict all members of a named political party is an abridgment of free speech, press and assembly. The Communist Party in this country is recognized as a political party. It is admitted to a place on election ballots and otherwise permitted to operate as political parties operate, and is subject to the laws directed at political parties.

It is true, as the Government contends, that this section of the statute does not in terms restrict freedom of speech, press or assembly. It is a limitation upon the use of facilities established and operated by the Government for the promotion of industrial peace and the betterment of industrial conditions. It is directed to the union and not to the individual. It provides, in effect, that if the union wishes to become the exclusive bargaining representative of its members, it cannot use the services of persons who belong to the proscribed political party, and the persons who belong to that party cannot become union officers. This is an abridgment of the rights of the members of the union to select their officers. Since the officers are, realistically and in common practice, the managers of the affairs of the organization and the spokesmen in its behalf, limitations upon their selection are limitations upon the speech and assembly of the members. Certainly the selection of officers is an essential element of an assembly and also of mass speech by a group of individuals. The statute also acts upon the individual who is a potential or prospective union officer and who holds the proscribed political belief. He must make a choice between his chosen vocation and furtherance of his political beliefs by party membership. These abridgments in the statute before us are upon the sole ground of political belief as evidenced by party affiliation.

This abridgment, however, is not an absolute suppression. The statute does not forbid membership in the Communist Party or prohibit Communist speech. It is an indirect, conditional, partial abridgment. It acts only when it requires a union to choose between members of the Communist Party and non-members for its officers, and when it requires an individual to

choose between vocation and political affiliation.

But the imposition of conditions upon the use of governmental facilities essential to legitimate activities, is subject to the restraints of the First Amendment. Congress cannot establish a Government facility which in practice becomes a necessity to activity in that field, and then impose upon the use of the facility a requirement that the persons involved waive a constitutional right; unless the necessities of the situation, which I shall discuss in a moment, require it. The cases dealing with newspapers and the second-class mail privileges are in point.[2]

Congress established by the National Labor Relations Act a system for determining an exclusive bargaining representative for employees in appropriate units of employ. As a result of that system, one representative, and one only, is the representative of all the employees in negotiating and contracting with the employer in respect to wages, hours, and terms and conditions of employment. It is perfectly obvious that a labor union which is prohibited from being the bargaining representative of any of its members with any employer, will not remain long in existence. It is denied the chief function of a labor union and obviously can present to employees little reason for membership in it. These are simple, realistic facts. Denial of the privilege of appearing on a ballot in any and every election of bargaining representatives is, in actual fact, a destruction of the union involved. Congress has created a facility the use of which has become an essential to the life of a labor union. A condition imposed upon the use of such facility is a limitation upon the existence of the union. Thus, a requirement as to political belief, imposed upon the use of the facility, is not a mere condition upon a privilege; it is, in fact, an abridgment of political belief.

It is no answer to say that a union which is unable to secure a majority in an election is in the same resulting position as one which is prohibited from participation. A constitutionally protected right cannot be abridged just because the abridgment has no worse effect than would failure to exercise the right. A man's right to speak cannot be denied him just because the result is no worse than it would be if he had nothing to say and so remained silent. A union which is unable ever to obtain a majority in an election may die a natural death, but that fact cannot justify its destruction by congressional mandate.

The first proposition is that the limitation in this clause of the statute is an abridgment of the freedoms of speech, press and assembly.[3]

B. The second proposition is that the freedoms protected by the First Amendment may be abridged if the public interest necessitates the abridgment. It is true that the language of the Amendment is unqualified: "Congress shall make no law * * * abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, * * *." But it is well established that the freedoms mentioned are not absolute and may be abridged for adequate reason.

There are at least three degrees of abridgment, and they must be considered separately in respect to the circumstances which make them valid. The three are (1) that abridgment incidental to the simple public revelation of a belief, (2) that which consists of a denial of specified

[2] Hannegan v. Esquire, Inc., 1946, 327 U.S. 146, 156, 66 S.Ct. 456, 90 L.Ed. 586; see Mr. Justice Brandeis and Mr. Justice Holmes, dissenting in United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson, 1921, 255 U.S. 407, 417, 436, 41 S.Ct. 352, 65 L.Ed. 704, 711, 720.

[3] American Steel Foundries v. Tri-City Council, 1921, 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360; National Labor Board v. Jones & Laughlin, 1937, 301 U.S. 1, 33, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Truax v. Ra'ch, 1915, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131, L.R.A.1916D, 545, Ann.Cas. 1917B, 283; Frost Trucking Co. v. Railroad Comm. of California, 1926, 271 U.S. 583, 593, 46 S.Ct. 605, 70 L.Ed. 1101, 47 A.L.R. 457. See, on the whole of this problem, the authorities collected and discussed in "Supersedure and the Purgatory Oath under the Taft-Hartley Law" by Boudin, 23 N. Y. U. L. Q. Rev. 72 (1948).

statutory civil privileges, and (3) a complete and direct suppression. The first was dealt with in the Barsky case, supra. Total suppression or prohibition has been dealt with by the Supreme Court in familiar cases, and the rule is well settled that speech and assembly can be directly suppressed only if the speech or assembly would cause or promote a clear and present danger to the national security.[4]

The second above-named form of abridgment is our present problem. It is midway of the other two extremes. It is not merely incidental and remote; neither is it a complete or direct suppression.

The facilities of the National Labor Relations Board were created by Congress for a major public purpose. Industrial peace and the betterment of industrial conditions are major in the life of the country. It seems to me that Congress could require that persons bent on destroying rather than promoting those objectives be not permitted to participate in the efforts toward them authorized by Congress. Congress is not condemned to impotency in such matters. "That the State has power to regulate labor unions with a view to protecting the public interest is, as the Texas court said, hardly to be doubted."[5]

This phase of this case must, it seems to me, be dealt with from an exceedingly practical point of view. We are not interested in forms of government as objets d'art of esthetic interest or even as philosophical concepts stimulating to intelligentsia. We are interested in them as workable means for the protection of men's rights and the coordination of men's affairs. If the principles of the Constitution are to be preserved, the government which that document constituted must operate as an effective instrument in an exceedingly practical world. In fashioning means and methods for the accomplishment of legitimate public tasks, Congress can, therefore, require that those means and methods be effective. It is not required to permit those who would prevent the accomplishment to do so in the easiest way, i. e., by obstructive participation in the actual operation. Thus, Congress could provide that persons and organizations bent on industrial war and confusion not be permitted to represent employees in bargaining with employers.

Looking at the matter from the precisely contrary point of view, it is equally clear that Congress cannot violate the prohibitions of the First Amendment by the guise of public purpose or necessity.

Looking at the problem from both points of view, it seems to me that the rule must be that the freedoms protected by the First Amendment can be abridged only if and only to the extent that they constitute clear and dangerous obstruction to the effective accomplishment of major public objectives. But they can be abridged if and to the extent that they do constitute such obstruction. This is my understanding of the necessary meaning of the clear and present danger rule, and my reading of the opinions in such cases as Thornhill v. Alabama,[6] Cantwell v. Connecticut,[7] and Thomas v. Collins.[8] In the last-named case, Mr. Justice Rutledge said for the Court: "For these reasons any attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger."[9]

If Congress had required an affidavit that the officer of the union did not advo-

---

[4] Schenck v. United States, 1919, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470, 473, 474; Cantwell v. Connecticut, 1940, 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352; West Virginia State Board of Education v. Barnette, 1943, 319 U.S. 624, 639, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674; Thornhill v. Alabama, 1940, 310 U.S. 88, 104, 105, 60 S.Ct. 736, 84 L.Ed. 1093; Thomas v. Collins, 1945, 323 U.S. 516, 532, 65 S.Ct. 315, 89 L.Ed. 430. See Abrams v. United States, 1919, 250 U.S. 616, 624, 630, 40 S.Ct. 17, 63 L.Ed. 1173. 1178, 1180 (dissenting opinion); Whitney v. California, 1927, 274 U.S. 357, 372, 376, 47 S.Ct. 641, 71 L.Ed. 1095 (concurring opinion).

[5] Thomas v. Collins, 1945, 323 U.S. 516, 532; 65 S.Ct. 315, 89 L.Ed. 430.

[6] 1940, 310 U.S. 88, 60 S.Ct. 736, 84 L. Ed. 1093.

[7] 1940, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213.

[8] 1945, 323 U.S. 516, 65 S.Ct. 315, 89 L. Ed. 430.

[9] Id. 323 U.S. at page 530, 65 S.Ct. at page 322.

cate the use of the strike for political purposes or merely to foment strife, and would not, under penalty, so advocate or act, I would find no constitutional objection. But Congress did not do that. It interdicted all members of a named political party.

Parenthetically, a comparison of the two clauses of Section 9(h) is interesting in this connection. By one clause the officer must swear that he is not a member of the Communist Party. That proscription is upon that Party as such, without qualification or exception. The other clause is strikingly different. It is directed to a particular belief. It proscribes those who believe in the overthrow of the Government by force or illegal methods. In other words, we are told that Congress concluded that members of the Communist Party are not likely to advocate the destruction of the Government by illegal means but that they are committed to industrial strife. Counsel for the Board was quite specific about this. In oral argument he said: "I have already indicated and tried to make clear what Congress did not find as the basis for this legislation as well as what it did find. It made no finding that the Communist Party believes in or teaches violent overthrow of the Government. It made no finding that all communists are necessarily agents of a foreign power or that all the communists had, in fact, engaged in the kind of political activities which Congress didn't want to protect, much less that any communist engaged in any violation of any law at all. It didn't find that at all. What it did find was that some communists and their supporters and some people who believed in the violent overthrow of the Government tended, by virtue of those facts, to utilize power as union leaders and as officers of the union for purposes other than those which Congress desired to protect. That is all that it found."

And again he said:

"Two things are extremely important about that, I think. One is that the definition itself and the form in which the affidavit is put demonstrates that Congress did not believe necessarily that membership in the Communist Party meant that a man believed in the overthrow of the Government by force and violence. It separated the categories quite clearly, either a member of the Communist Party, or affiliated with the Communist Party, on the one hand, or believes in the overthrow of the Government or supports an organization which believes in that principle the same way.

\* \* \* \* \* \*

"I agree there is a wide gap there and Congress did not find—I might as well make it perfectly clear now—it did not find and it did not purport to find, and it is our position that it did not need to and could not properly have found, that the Communist Party advocates the doctrine of violent overthrow of the Government by force or other unconstitutional means. That is just no part of this case."

Upon the evidence of which the court takes judicial notice and which the Government presses upon us, this is a curious diversity of conclusion. In the Congress and in the public press, there are many declarations that the Communist Party is a subservient tool of a foreign power and, as such, bent upon the destruction of our Government by force or illegal methods. Curiously, part of the evidence cited and quoted by the court in this case as supporting the conclusion that the Communist Party foments industrial strife, is actually that that party seeks to overthrow the Government. But we are told by the Government that Congress did not reach the latter conclusion and "could not properly have [so] found".

However, to resume the thread of consideration toward a conclusion, it next seems to me that Congress could forbid to all members of a named political party certain specified privileges only if it be a fact that members of that party would misuse those privileges and impede their public purpose. The Government takes a different view. It says that Congress has concluded that Communists in labor organizations might use the strike for political purposes and might use their power to stir up strife instead of promoting peace, and that this conclusion is sufficient to support the interdiction. The "might" in this part of its contention is intentional. The brief never makes any

contention except that Communists "might" do these things; it never asserts that the evidence before Congress shows that they *would,* or that they *probably* would. That this was the full extent of its position was made clear and emphatic by counsel upon the oral argument. Counsel for the Board said: "There is, we believe, adequate evidence upon which Congress could conclude that part of the philosophy and program of the Communist Party is to regard labor unions as political rather than economic instrumentalities. We believe that Congress could further conclude and it did conclude that membership in the Communist Party or support of an organization dominated by the Communist Party gave reason to believe that an individual might —not necessarily must, but might—if he became an officer of a labor organization or was such an officer, be influenced by the doctrine of the organization of which he was a member and utilize or tend to lead his organization into paths of political action in the interest of the Communist Party rather than in the paths of economic action that Congress wanted to promote." And again he said: "The connections that are important are whether Congress could view the doctrine of the Communist Party with reference to labor organizations, their purposes and their uses, whether it could take cognizance of the view of the Communist Party in that field and whether it could say that we believe that some people who are members of the Communist Party may, by virtue of that fact—not must and not all—but that some may by virtue of that fact utilize their positions in labor organizations to turn them into political weapons to support the Communist Party doctrine, or causes, or programs, or policies, rather than to foster collective bargaining as a friendly method of adjustment of disputes, rather than utilization of their labor organizations as purely an economic weapon to raise the wages and hours and working conditions of the laborers underneath. That, Your Honor, is the position we take here."

Thus, the question posed by the contention as actually made by the Government, is whether Congress may deny a Government facility to all members of a named organization because it finds that some such persons might—not all such persons but some, and not must but might—use the facilities for an undesirable end. If the effect of the denial of the benefit were not an infringement of a constitutional right, I might agree with the Government's view. But where the denial of the benefit is in actual practice an abridgment of a constitutional right, its validity requires more than a possibility of untoward action; there must be a real probability, perhaps even a certainty; at any rate a clear and present danger.[10]

As I read the opinion, the majority of the court does not rest its decision upon the contention as made by the Government. It finds that Communists will and do use positions of power in labor organizations to foment strife and to provoke strikes for political purposes, and that such is the avowed purpose, determination and commitment of the Communist Party. This brings us to the third proposition in the course of our reasoning.

C. How is the court to know that members of the Communist Party will misuse the facilities of the National Labor Relations Board? My brethren say that the testimony before the Congressional Committees, the reports of those Committees, and reports in the press establish those facts. The Government says that the conclusions of Congress are "derived from the personal experience and observation of the legislators and from testimony before the House and Senate Committees which considered the bill, and they comported' with the conclusions reached by other

---

[10] In addition to the cases elsewhere cited, see Schaefer v. United States, 1920, 251 U.S. 466, 40 S.Ct. 259, 64 L.Ed. 360; Schneider v. State, 1939, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155; Gidlow v. New York, 1923, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138; Pennekamp v. Florida, 1946, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295; Bridges v. California, 1941, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192, 159 A.L.R. 1346; Herndon v. Lowry, 1937, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066; De Jonge v. Oregon, 1937, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278.

Committees of Congress, and with the judgment of many trade union leaders and numerous experts in the field of industrial relations."

It is my view that such evidence is not enough. I think that the court itself must determine upon evidence presented to it whether the facts are as Congress concluded them to be. Congress cannot, in my view, directly abridge a right protected by the First Amendment merely by making an affirmation of a fact. If it could, it could flout the Amendment with impunity.

The Supreme Court has stated the rule many times in familiar cases.[11] Mr. Chief Justice Hughes stated the heart of the matter thus in his careful analysis of the subject in the St. Joseph Stock Yards case: "When the legislature acts directly, its action is subject to judicial scrutiny and determination in order to prevent the transgression of these limits of power. The legislature cannot preclude that scrutiny and determination by any declaration or legislative finding. Legislative declaration or finding is necessarily subject to independent judicial review upon the facts and the law by courts of competent jurisdiction to the end that the Constitution as the supreme law of the land may be maintained." [12]

It may be that if the difference of opinion between us in the present case were reduced by analysis to its ultimate essence, that residual precipitate would be the question whether (1) the court must determine merely whether there was a rational factual basis for the conclusion of Congress, entitled to strong presumption of constitutionality, or (2) the court must determine whether there was in fact a clear and present danger necessitating, or at least justifying, the abridgment of freedoms.

I think that under Supreme Court decisions different rules apply when a statute is challenged under a provision of the Constitution, such as the interstate commerce clause, which delegates power to the Congress, and when the challenge is violation of the prohibitory First Amendment.[13] The strong presumption of constitutionality which attaches to an act of Congress challenged for lack of power under one of the delegations of power, does not attach to an act challenged as violative of the prohibitions of the First Amendment. It is perfectly true, as the Supreme Court said in the passage quoted by my brethren from the opinion in Thomas v. Collins,[14] that "That judgment in the first instance is for the legislative body." Of course, Congress must first make a conclusion and enact a statute before the courts are called upon to pass upon its validity. The next sentence in Mr. Justice Rutledge's statement is the one in which we are here interested. He said: "But in our system where the line can constitutionally be placed presents a question this Court cannot escape answering independently, whatever the legislative judgment, in the light of our constitutional tradition. Schneider v. State, 308 U.S. 147, 161 [60 S.Ct. 146, 150, 84 L.Ed. 155]. And the answer, under that tradition, can be affirmative, to support an intrusion upon this domain, only if grave and impending public danger requires this."

In examining the evidence which the court says is before us by reason of having been before Congress and in the public press, I cannot overlook the opinions of the Supreme Court in the Schneiderman case [15] and in Bridges v. Wixon.[16] One must read the whole of those opinions to understand my view in respect to them.

[11] St. Joseph Stock Yards Co. v. United States, 1936, 298 U.S. 38, 56 S.Ct. 720, 80 L.Ed. 1033; Borden's Farm Products Co. v. Baldwin, 1934, 293 U.S. 194, 209, 210, 55 S.Ct. 187, 79 L.Ed. 281; see Busey v. District of Columbia, 1943, 78 U.S. App.D.C. 189, 192, 138 F.2d 592, 595.

[12] St. Joseph Stock Yards Co. v. United States, 1936, 298 U.S. 38, 51, 52, 56 S. Ct. 720, 726, 80 L.Ed. 1033.

[13] Compare West Virginia State Board of Education v. Barnette, 1943, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A. L.R. 674; and United States v. Carolene Products Co., 1938, 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234.

[14] Supra note 8, 323 U.S. at page 531, 65 S.Ct. at page 323.

[15] Schneiderman v. United States, 1943, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796.

[16] 1945, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103.

The question in the Schneiderman case was whether an active member and leader of the Communist Party could be "attached to the principles of the Constitution of the United States". The District Court, upon voluminous evidence presented to it in the course of the trial, which evidence included all the data of which this court now takes judicial notice, or the equivalent of it, made a finding of fact that such member could not be so attached. The Supreme Court set aside that finding because, it said, the evidence was not "clear and convincing". The decision upon the legal point involved in that case is not relevant here. What is relevant is that the Court, after an exhaustive examination of evidence, from the Communist Manifesto of 1848 through many writings and Communist Party documents down to the date of the case, held that the attitude of the Communist Party toward force and violence was not clear. In Bridges v. Wixon, supra, the Court set aside the findings, made upon evidence, as to the attitude of an individual based upon the program of the Party. How, then, can we say, as a matter of judicial notice, and without evidence taken in the course of a judicial proceeding, that the program of the Party is such that any member of it represents, ipso facto, a clear and present danger to the public interest in the industrial field? Surely the evidence of a necessity for an abridgment of the freedoms named in the First Amendment must be clear and convincing. There is no great difficulty about taking evidence, and if the facts be as plain and overwhelming as the court thinks they are, there would be no difficulty in finding them. But in dealing with an abridgment of free speech, press and assembly, I cannot bring myself to accept the doctrine that any rational basis for the abridgment is sufficient, or that congressional conclusions of fact, testimony taken by congressional committees, or impressions gleaned from the public press are, without more, a sufficient basis for the exercise of the judicial function under the prohibitory provisions of the First Amendment. Such showing is sufficient to justify, and even to require, congressional inquiry, but it is not enough for a positive statutory interdiction of all members of a named political party.

Of course, to say, in the midst of the current wave of affirmations as to the program of the Communist Party in industrial matters, that the court does not know what that program is leaves one open to chiding, and perhaps to reproach, for obtuseness.[17] But a court cannot give heed to current waves of popular opinion in its dealings with constitutional rights. The fundamental, basic concepts of the First Amendment as a constitutional provision, and of the judiciary as an organ of constitutional government, require that the court itself must ascertain whether the facts are such as to require the abridgment of those rights.

The Supreme Court has said repeatedly, in cases above cited, that the courts must "determine independently", or some equivalent expression, the facts when constitutional questions of congressional power are presented. No case is cited to us, and I have found none, where that Court has said that when Congress has made a conclusion of fact upon which the constitution-

---

[17] The provision in the Emergency Relief Appropriation Act, fiscal year 1943, 56 Stat. 634, 640, July 2, 1942, 15 U.S.C.A. §§ 721–728 note, requiring an affidavit that a person is not "a Communist", was held by the District Court of New Jersey to be too vague for criminal enforcement. United States v. Hautau, 1942, 43 F. Supp. 507, 510. Judge Fake said, "Moreover, the Court also finds itself in a position where it can not give a reasonably certain inclusive and exclusive definition of the word." On the other hand, Judge Woolley, of the Court of Appeals for the Third Circuit, in United States v.

Tapolcsanyi, 1930, 40 F.2d 255, 257, said, "While every tolerably informed person knows what a Communist is, we are not informed precisely what is a 'red' Communist * * *."

The Selective Training and Service Act of 1940 contained a provision, Sec. 8(i), 54 Stat. 892, 50 U.S.C.A.Appendix § 308 (i), which expressed a policy of Congress that vacancies in employment rolls caused by an induction into service not be filled by "a member of the Communist Party". We are not cited to any case in which that provision was involved.

ality of an act depends, the courts must take evidence upon those facts. But it seems to me that such must be the rule. Certainly, as I have said, Congress cannot establish its own power by a mere affirmation of fact. Moreover, congressional methods of taking testimony are not such as to assure accuracy in the ultimate determinations of fact. The Amendment, it must be remembered, was a limitation upon the Congress, and the function of the federal judiciary as a coordinate branch of government was to insure the observance of that limitation. Perhaps constitutional validity under the prohibitory Amendments requires treatment different from other constitutional questions, and I, therefore, limit these observations to that type of question. I see no way by which the courts can exercise their constitutional functions in this type of case except by taking evidence.

The Circuit Court of Appeals for the Ninth Circuit,[18] the Supreme Court of California,[19] and the Supreme Court of Washington [20] have considered the questions we are here considering, and I find myself in agreement with them. The opinion of the California court is exhaustive and too long to quote, but its views are mine. Upon similar grounds the United States District Court for the Northern District of Illinois held void a statute which forbade a place on the ballot to any political organization which is associated with Communist principles.[21] The Circuit Court of Appeals for the First Circuit has said [22] that "The program of the Red International Labor Union and the Communists is now a matter of general knowledge", but the court acted in that case upon evidence introduced into the record. The same observation may be made in respect to United States v. Commissioner of Immigration,[23] Kjar v. Doak,[24] Ungar v. Seaman,[25] United States v. Curran,[26] and Ex parte Coon.[27] The Supreme Court of Arkansas upheld the constitutionality of a statute which forbade a place on the ballot to political parties which advocate the overthrow of government by force or violence, and applied that prohibition to the Communist Party, but it did so upon evidence in the record.[28]

In the instant case, the court has dismissed the petition upon motion. That is equivalent to saying that a person alleging to the courts that an act of Congress is an invalid invasion of his constitutional rights under the First Amendment will not be permitted to prove that his allegation is true, if Congress has declared to the contrary upon the personal observations of some of its members and declarations of the country's press. I do not believe that to be the law.

To sum up my view—since this clause of the statute is an abridgment of freedoms of speech, press and assembly, its validity depends upon a direct factual connection between the test it prescribes and the objective it seeks; when validity is challenged under the First Amendment, the facts upon which validity depends must be determined by independent examination by the court.

III. A few comments upon the opinion of the court must be made in order to clarify the difference between us.

It seems to me that the opinion proceeds as though the problem were merely what to do with the Communists. That might indeed be simple. But that is not the problem. The problem is how to deal with the Communists and at the same time preserve inviolate the freedoms of speech, press and assembly. It is not disposition of the Communists which creates the difficulty; it is the First Amendment.

---

[18] Ex Parte Fierstein, 1930, 41 F.2d 53.

[19] Communist Party of United States v. Peek, 1942, 20 Cal.2d 536, 127 P.2d 889.

[20] State v. Reeves, 1940, 5 Wash.2d 637, 106 P.2d 729, 130 A.L.R. 1465.

[21] Feinglass v. Reinecke, 1942, 48 F. Supp. 438.

[22] Murdoch v. Clark, 1 Cir., 1931, 53 F.2d 155, 157.

[23] 2 Cir., 1932, 57 F.2d 707.

[24] 7 Cir., 1932, 61 F.2d 566.

[25] 8 Cir., 1924, 4 F.2d 80.

[26] 2 Cir., 1926, 11 F.2d 683.

[27] 1941, 44 Cal.App.2d 531, 112 P.2d 767.

[28] Field v. Hall, 1940, 201 Ark. 77, 143 S.W.2d 567.

The court points to the declaration of reasons for and purposes of the amendments to the Act in 1947, as they appear in Section 1 thereof. Congress there said that "certain practices by some labor organizations" have the effect of obstructing commerce. This carefully restrained congressional declaration emphasizes the points which I have discussed.

I cannot agree that this statute is merely an identification measure and, therefore, covered by the Barsky case, supra. The court says, "Section 9(h), in requiring the affidavit, seeks nothing except to identify the individuals who believe in Communism and those who belong to the Party." It seems to me that the court thus ignores that which is plain. This statute is no mere requirement that an officer of a union identify himself. The provision is that the union of which he is an officer may not participate in the facilities of the Board, unless he swears that he is not a member of the Communist Party. This is so plain that discussion would merely confuse it.